# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

STURMANSKIE LLC, a Delaware limited
liability company;

       Plaintiff,

v.

PICTUREMAXX AG, a German company;

and

GERHARD FEIGL, an individual;

and

MARCIN CZYZEWSKI, an individual

and

MATTHIAS DITTLER, an individual;

and

THOMAS KIESSL, an individual

and

ALEXANDER RÜEGG, an individual

       Defendants.

_____/

Case No.   1:21-cv-21091

**VERIFIED COMPLAINT**

       Plaintiff, STURMANSKIE LLC, by and through its undersigned counsel, hereby sues

PICTUREMAXX AG, GERHARD FEIGL, MARCIN CZYZEWSKI, MATTHIAS DITTLER,

THOMAS KIESSL, and ALEXANDER RÜEGG and alleges as follows:

## INTRODUCTION

1.      This is an action for, *inter alia*, securities fraud, tortious interference in contract rights, breach of contract, and conversion, arising out of (a) Defendants' fraudulent and tortious conduct in relation to the issuance of securities of Defendant PICTUREMAXX AG ("PMAG"); (b) Defendant PMAG's breach of its contract with Plaintiff; Defendants' tortious interference with Plaintiff's contract with Champlain Holding, S.A., a Panamanian company ("Champlain"); and (c) Defendants' tortious interference with Plaintiff's contract with Supreme Asset AG,  a Swiss company, ("Supreme")

2.      In April 2018, Plaintiff was the owner of 18,866 shares of PMAG common stock which were in the form of uncertificated bearer shares, which is permissible under German law.

3.      On April 24, 2018, Plaintiff entered into a share purchase agreement (the "SPA") to sell its 18,866 shares to a third party, Champlain, for 125 euros per share, an aggregate amount of 2,358,250 euros.

4.      However, Champlain did not have the funds to complete the purchase.  Therefore, the SPA specified that Champlain would make the payment of 2,358,250 euros in full by September 30, 2018.

5.      Champlain's Swiss lawyers, Barandun von Graffenried, proposed that, as security for the performance of Champlain's payment obligation, Champlain would execute a notarized bill of sale for 68,000 shares of PMAG to Plaintiff (the "Escrow Shares") and deposit the Escrow Shares with an escrow agent.  Plaintiff accepted this Escrow Shares as acceptable security, both parties taking into account the significant risks attendant in taking the Escrow Shares as sole security.

6.     The terms of the escrow of the Escrow Shares were governed by an escrow agreement between Plaintiff, Champlain, and Kravitz & Co. PA ("K&Co."), a Coral Gables, Florida, law firm, governed by Florida law where the parties had agreed to exclusive jurisdiction in Miami-Dade County, Florida (the "Escrow Agreement").

7.     Champlain executed a notarized and apostilled bill of sale for 68,000 shares of PMAG to Plaintiff in Panama (executed by its directors) (the "NBOS") and delivered the original NOBS, together with an authorizing board resolution, the executed SPA and the executed Escrow Agreement to Barandun von Graffenried.

8.     At closing, Plaintiff executed the SPA and Escrow Agreement and delivered to Champlain a legalized acknowledgment of the sale (done at the German Consulate in Miami), in the form specified in the SPA, evidencing the transfer of the 18,866 shares of PMAG to Champlain.

9.     In return, Champlain, through Barandun von Graffenried, delivered to K&Co the NBOS for 68,000 shares of PMAG (the "Escrow Shares") as required under both the SPA and the Escrow Agreement.

10.     On September 30, 2018, Champlain failed to make the payment of 2,358,250 euros and Plaintiff informed Champlain that it had requested the NBOS from K&Co. for the Escrow Shares under the terms of the Escrow Agreement (giving the 10 days' notice required under the Escrow Agreement).

11.     At the conclusion of the 10 day notice period, K&Co delivered the NBOS for the Escrow Shares to Plaintiff.

12.     Thereafter, for approximately one year, Plaintiff, through its counsel, K&Co. made repeated proposals to Champlain in an attempt to get Champlain to pay the amount due of

2,358,250 euros.  However, the attempts were unsuccessful and Plaintiff decided to register the transfer of Escrow Shares from Champlain to Plaintiff with PMAG.

13.     On December 5, 2019, Plaintiff, through its counsel K&Co. contacted Defendant PMAG to register the Escrow Shares on Defendant PMAG's books and records in Plaintiff's name.  At first, Defendant PMAG refused to register the shares, claiming that it had no knowledge of the situation.

14.     Prior to Plaintiff's contact with Defendant PMAG, Defendant PMAG had begun the process of registering (on its shareholder register) its previously unregistered bearer shares. The status of the Escrow Shares was that they were held, effectively in "suspense", in the name of a neutral German bank, along with other bearer shares that had not yet been registered.

15.     Defendant PMAG, through its officers and Management Board ("*Vorstand*") members (Defendants GERHARD FEIGL ("GF"), its CEO and MARCIN CZYZEWSKI ("MC"), its CTO), requested several proofs of Plaintiff in order for Plaintiff to demonstrate its ownership of the Escrow Shares.

16.     As part of their determination of the ownership of the Escrow Shares, Defendants contacted Champlain, having refused to pay the purchase price for the 18,866 shares under the SPA, now denied that Plaintiff was the rightful owner of the Escrow Shares.  Champlain, through its new attorneys, put forward several completely spurious claims, including (a) denying the transaction ever took place, (b) questioning whether Plaintiff was in possession of the original NBOS, and (c) questioning whether Plaintiff's Manager and law firm actually acted for it.

17.     Plaintiff provided PMAG with incontrovertible documentary proof proving the chain of title and its right to ownership of the Escrow Shares.

18.     Specifically, on July 7, 2020, Champlain asserted that the SPA was null and void because the Escrow Shares were "over-securitization" under Swiss law. Plaintiff strenuously refuted this argument.

19.     Beginning in the Spring of 2020 and culminating in the beginning of August 2020, Plaintiff engaged German law firms and drafted a complaint to be filed in Munich, Germany.  Plaintiff communicated this draft complaint to Defendant PMAG in early August 2020.

20.     On August 14, 2020, Defendant PMAG informed Plaintiff that it no longer had any objections, that it agreed Plaintiff was the owner of the Escrow Shares, that Champlain's objections did not have any merit, and that it would register the Escrow Shares in Plaintiff's name.  Defendant PMAG noted that this action was determined by both its Management Board and its Supervisory Board ("*Aufsichtsrat*") members (Defendants MATTHIAS DITTLER ("MD"), THOMAS KIESSL ("TK"); and ALEXANDER RÜEGG ("AR")).

21.     However, in order to perform the administrative act of registering the Escrow Shares in Plaintiff's name, Defendant PMAG required that Plaintiff open a bank account for Defendant PMAG to deposit the Escrow Shares, which were "uncertificated".

22.     Plaintiff was unable to open a bank account which could hold the Escrow Shares because (a) European banks contacted by Plaintiff, which are capable of holding uncertificated shares in unlisted German public companies, would not open a bank account for a U.S. company because of U.S. securities and banking laws and (b) U.S. banks (or broker-dealers) would open an account, but would not hold uncertificated shares in unlisted German public companies.

23.     Plaintiff requested assistance from Defendant PMAG, specifically to ensure that Defendant PMAG registered the Escrow Shares in Plaintiff's name on its books and records

while Plaintiff was attempting to open a suitable bank or brokerage account. However, Defendant PMAG refused to do so.

24.     As a result, Plaintiff was forced to sell its shares. Plaintiff identified a buyer and entered into a contract whereby it would sell a buyer (which was a Swiss company that did not have an issue depositing uncertificated shares in unlisted German public companies in its bank accounts) the Escrow Shares for an aggregate amount of 6,800,000 euros (the "Escrow Share Sale Agreement").

25.     Prior to entering into the Escrow Share Sale Agreement, Plaintiff, through its German lawyer, contacted Defendant PMAG to ensure that the form of the Escrow Share Sale Agreement was acceptable to Defendant PMAG and that Defendant PMAG would register the Escrow Shares in the buyer's name. Defendant PMAG replied in the affirmative and therefore, Plaintiff executed the Escrow Share Sale Agreement with the buyer.

26.     Plaintiff sent the executed Escrow Share Sale Agreement on December 1, 2020 with a request to transfer the Escrow Shares to the buyer, as promised. After not responding for over a week, Defendant PMAG informed Plaintiff that its Management Board and Supervisory Boards had reversed their decision. As a result, Plaintiff was unable to conclude the transaction in the executed Escrow Share Sale Agreement and was placed in breach of that agreement.

THE PARTIES

27.     Plaintiff STURMANSKIE LLC is a limited liability company organized and in good standing under the laws of the State of Delaware, with its registered office at 3411 Silverside Road, Tatnall Building #104, Wilmington, Delaware 19810. At all times relevant to this action, Plaintiff acted through its Manager, Adam Kravitz, or its counsel, Kravitz & Co. PA, both located in Miami-Dade County, Florida.

28.     Defendant PICTUREMAXX AG is an *Aktiengesellschaft* (joint stock company) organized and existing under the laws of the Federal Republic of Germany with its registered address at Stefan-George-Ring 2, 81929 Munich, Germany.

29.     Under German company law, an *Aktiengesellschaft* has a two-tier board system. A Supervisory Board, called an *Aufsichtsrat*, which is elected by the shareholders and appoints the members of the Management Board (called the *Vorstand*) and must approve major corporate decisions.  In this case, all decisions regarding the registration of the Escrow Shares were made by both the Supervisory Board and the Management Board.

30.     Defendant GERHARD FEIGL ("GF") is an individual and a citizen of the Federal Republic of Germany.  GF maintains an address at Stefan-George-Ring 2, 81929 Munich, Germany.  GF is a member of the Management Board.

31.     Defendant MARCIN CZYZEWSKI ("MC") is an individual and a citizen of the Federal Republic of Germany.  MC maintains an address at Stefan-George-Ring 2, 81929 Munich, Germany. MC is a member of the Management Board.

32.     Defendant MATTHIAS DITTLER ("MD") is an individual and a citizen of Switzerland.  MD maintains an address at Stefan-George-Ring 2, 81929 Munich, Germany. MD is a member of the Supervisory Board.

33.     Defendant THOMAS KIESSL ("TK") is an individual and a citizen of the Federal Republic of Germany.  TK maintains an address at Stefan-George-Ring 2, 81929 Munich, Germany. TK is a member of the Supervisory Board.

34.     Defendant ALEXANDER RÜEGG ("AR") is an individual and a citizen of Switzerland.  AR maintains an address at Stefan-George-Ring 2, 81929 Munich, Germany.  AR is a member of the Supervisory Board.

JURISDICTON AND VENUE

35.     This Court has subject matter jurisdiction as this action is brought pursuant to Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5), with such jurisdiction being expressly conferred pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) (particularly 15 U.S.C. § 77v(c)(2) "*conduct occurring outside the United States that has a foreseeable substantial effect within the United States*") and Section 27 of the Exchange Act (15 U.S.C. § 78aa), as well as under 28 U.S.C. §§ 1331 and 1337.  This Court has supplemental jurisdiction over all of the pendent state law claims in accordance with 28 U.S.C. §1367.

36.     Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332. Plaintiff is a Delaware limited liability company which acted through its Manager and legal counsel located in Florida. All defendants are foreign corporations or individuals located in the Federal Republic of Germany (some are citizens of Switzerland). None of the defendants are lawfully admitted for permanent residence in the United States or are domiciled in the United States.  The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000. Therefore, specifically under 28 U.S.C. § 1332(a)(2), this Court has subject matter jurisdiction in this action.

37.     This Court has *in personam* jurisdiction over all defendants since they have transacted substantial business in Florida with the Plaintiff, including several email communications, and committed numerous tortious acts in Florida.  The causes of action alleged herein arise specifically out of these forum contacts.

38.     Venue is properly laid in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. §1391(b) and (c).  The acts and conduct

complained of herein, including the intended receipt of email communications and numerous tortious acts, as well as the issuance and dissemination of materially false and misleading information to Plaintiff, occurred in substantial part in this District.  In connection with the acts and conduct alleged in this Verified Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including email.  Furthermore, all defendants reside outside of the United States and, therefore, venue in any Federal District Court is proper.

39.     All conditions precedent to the initiation and maintenance of this action have been performed or have occurred.

## **FACTS COMMON TO ALL COUNTS**

40.     Plaintiff is a Delaware limited liability company.  At all times relevant to the facts set forth in this Complaint, Plaintiff acted through its Manager, Adam Kravitz ("Kravitz"), and its counsel, Kravitz & Co., PA, a Florida law firm ("K&Co"), both located in Coral Gables, Florida.

41.     In April 2018, Plaintiff was the owner of 18,866 shares of PMAG common stock. Under the German Stock Corporation Act (the "*Aktiengesetz*" or "*AktG*"), which governs the formation and organization of *Aktiengesellschaft*, it is possible to issue shares in the form of uncertificated bearer shares.  This means that the owner of the shares must prove themselves through chains of title, including contracts and bills of sale.  Plaintiff had purchased the 18,866 shares from a third party and possessed the contract and an acknowledgement of the sale for these shares which had been legalized at the German consulate in Miami.

42.     On April 24, 2018, Plaintiff entered into a share purchase agreement (the "SPA") to sell the 18,866 shares to, Champlain Holding, S.A., a Panamanian company ("Champlain"), for 125 euros per share, an aggregate amount of 2,358,250 euros.

43.     Champlain did not have the funds to complete the purchase at the time.  However, Champlain, though its counsel, Michael Hess ("Hess"), a lawyer with the firm Barandun von Graffenried ("BvG"), in Zurich, Switzerland, stated that it wished to take possession of the shares immediately as there was an upcoming PMAG shareholders meeting in late May 2018. These negotiations took place between BvG and K&Co primarily via email, with K&Co located in Coral Gables, Florida.

44.     The resulting SPA specified that Champlain would make the payment of 2,358,250 euros in full by September 30, 2018 but would immediately receive an acknowledgement of the sale, legalized at the German consulate in Miami, evidencing the transfer of the 18,866 shares of PMAG to Champlain.  As security for Champlain's performance of its payment obligations under the SPA, Champlain would deliver to K&Co, as an escrow agent, a notarized acknowledgement of sale for 68,000 shares of PMAG (the "Escrow Shares") from Champlain to Plaintiff.

45.     The terms of the escrow of the Escrow Shares were governed by an escrow agreement between Plaintiff, Champlain and K&Co governed by Florida law where the parties had agreed to exclusive jurisdiction in Miami-Dade County, Florida.

46.     On May 24, 2018, pursuant to the SPA, Plaintiff delivered the original acknowledgement of the sale, legalized at the German consulate in Miami, evidencing the transfer of the 18,866 shares of PMAG to Champlain.

47.     In return, BvG delivered to K&Co an original acknowledgement of sale for the Escrow Shares, which was executed by Champlain and notarized and apostilled in Panama.

48.     On September 30, 2018, Champlain failed to make the payment of 2,358,250 euros.  Therefore, Plaintiff informed Champlain by email that it had requested, from K&Co,

possession of the original acknowledgement of sale for the Escrow Shares as Plaintiff was entitled to do under the terms of the escrow agreement.  Several emails were exchanged between BvG and K&Co and Champlain did not either (a) deny that the payment of 2,358,250 euros was due, or (b) pay the payment of 2,358,250 euros to Plaintiff.  When informed by K&Co that it was delivering to Plaintiff the original notarized acknowledgement of sale for the Escrow Shares, after the 10-day notification period specified in the Escrow Agreement, neither Champlain nor BvG objected.

49.     Despite the delivery to Plaintiff of the original notarized acknowledgement of sale for the Escrow Shares, Plaintiff, through K&Co. continued to make repeated proposals to Champlain in an attempt to get Champlain to pay the amount due of 2,358,250 euros in exchange for the return of the Escrow Shares.  These attempts took place over the period from October 2018 until November 2019.

50.     However, the attempts were unsuccessful, and Plaintiff decided to register the Escrow Shares on the share register of PMAG.  Plaintiff had learned sometime in mid-2019 that PMAG was creating a share register with the goal of registering all of the bearer shares.

51.     On December 5, 2019, Plaintiff, through its counsel K&Co. contacted Defendant PMAG to register the Escrow Shares on Defendant PMAG's books and records in Plaintiff's name.   At first, Defendant PMAG refused to register the shares, claiming that it had no knowledge of the situation.

52.     Defendant PMAG, through its officers and Management Board ("*Vorstand*") members (Defendants GERHARD FEIGL ("GF"), its CEO and MARCIN CZYZEWSKI ("MC"), its CTO) (collectively the "Management Board Defendants"), and by its Supervisory Board ("*Aufsichtsrat*") members (Defendants MATTHIAS DITTLER ("MD"), THOMAS

KIESSL ("TK"); and ALEXANDER RÜEGG ("AR") (collectively the "Advisory Board Defendants")) requested substantial documentation of Plaintiff in order for Plaintiff to demonstrate its ownership of the Escrow Shares.

53.     Plaintiff is informed and believes that Defendants requested excessive documentation and created difficulty because Defendants preferred keeping the Escrow Shares registered to Champlain and believed that if they created enough hurdles for Plaintiff, Plaintiff would simply walk away from the transaction.

54.     Plaintiff, at significant expense, including the production of notarized and apostilled documents, complied with Defendant PMAG's requests.  In addition, plaintiff was forced to engage lawyers in Germany and ultimately threatened a lawsuit in Germany.

55.     On August 14, 2020, in order to avoid the lawsuit, Defendant PMAG informed Plaintiff via email that it no longer had any objections, that it recognized Plaintiff as the owner of the Escrow Shares, and that it would register the Escrow Shares in Plaintiff's name.  Defendant PMAG noted that this action was determined by the Management Board Defendants and the Advisory Board Defendants.

56.     However, in order to for it to register the Escrow Shares in the name of Plaintiff, Defendant PMAG required that Plaintiff open a bank account for Defendant PMAG to deposit the Escrow Shares, which, while registered were still in "uncertificated" form.

57.     Plaintiff was unable to open a bank account which could hold the Escrow Shares. Because of tightening of anti-money laundering and tax avoidance provisions, through no fault of Plaintiff's own, (a) European banks contacted by Plaintiff, which are capable of holding uncertificated shares in unlisted German public companies, would not open a bank account for a U.S. company citing U.S. securities and banking laws and (b) U.S. banks (or broker-dealers)

would open an account, but would not hold uncertificated shares in unlisted German public companies because they were not set up to hold foreign shares without a quoted price.

58.     Plaintiff has previously noted this potential difficulty and requested assistance from Defendant PMAG, specifically to ensure that Defendant PMAG registered the Escrow Shares in Plaintiff's name on its books and records while Plaintiff was attempting to open a suitable bank or brokerage account.  However, Defendant PMAG refused to do so.

59.     As a result, Plaintiff was forced to sell the Escrow Shares.  Plaintiff identified a buyer, Supreme, and entered into a contract whereby it would sell Supreme (which as a Swiss company that did not have an issue depositing uncertificated shares in unlisted German public companies in its bank accounts) the Escrow Shares for an aggregate amount of 6,800,000 euros (the "Escrow Share Sale Agreement").

60.     Prior to entering into the Escrow Share Sale Agreement, Plaintiff contacted Defendant PMAG to ensure that the form of the Escrow Share Sale Agreement was acceptable to Defendant PMAG and that Defendant PMAG would register the Escrow Shares in the Supreme's name.  Defendant PMAG replied by email in the affirmative.

61.     Relying on Defendant PMAG's representations, as directed by the Management Board Defendants and the Advisory Board Defendants, Plaintiff executed the Escrow Share Sale Agreement with Supreme.

62.     On December 1, 2020, Plaintiff sent the executed Escrow Share Sale Agreement with instructions to deposit the Escrow Shares in the bank account specified by Supreme.

63.     Defendant PMAG refused to respond for several days.  On December 9, 2020, Defendant PMAG informed the Plaintiff that the Management Board Defendants and the

Advisory Board Defendants had, without any previous notice to Plaintiff, reversed their decision and now refused to deposit the Escrow Shares in Supreme's bank account.

64.     The December 9th letter explicitly stated that the Defendants had communicated with Champlain and would continue to hold the shares in "suspense".  Defendants would not disclose the details of their communications with Champlain, despite repeated request by Plaintiff.

65.     As a result, Plaintiff was unable to conclude the transaction set forth in the executed Escrow Share Sale Agreement and was placed in breach of that agreement and suffered damages in the amount of 4,441,750 euros, which is the difference between the sale price of 6,800,000 euros in the Escrow Share Sale Agreement and the cost of the Escrow Shares, which is the 2,358,250 euros that was not paid by Champlain.

66.     Plaintiff informed Defendants that it would bring a claim in the United States for the above damages of 4,441,750 euros and sent Defendants a draft complaint to show its determination to pursue its claim.

67.     As a result, in early March 2021, Plaintiff and Defendants held two video conferences.  In those conferences, Plaintiff learned for the first time that Defendants had continuing communications with Champlain had had, without any notice whatsoever to Plaintiff, transferred ownership of the Escrow Shares to Champlain (specifically putting unrestricted shares into Champlain's bank account), putting the Escrow Shares beyond the reach of Plaintiff.

68.     Despite repeated demand, Defendants continue to refuse to disclose the details of their communications with Champlain and the details of the transfer of the Escrow Shares to Champlain.

## COUNT I

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER
(Direct Cause of Action against Defendant PMAG)
(Aiding and Abetting against the Membership Board Defendants
and the Advisory Board Defendants)

69.     Plaintiffs reallege and incorporate herein Paragraphs 1 through 68 of this Complaint as if fully set forth herein.

70.     The acts complained of in this Complaint involved the purchase and sale of "securities," within the meaning of Section 2(1) of the Securities Act (15 U.S.C. § 77b(1)) and Section 3(a)(10) of the Exchange Act (15 U.S.C. § 78c(a)(10)), by means of written and oral communications to the United States, and by use of the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

71.     In stating to Plaintiff that it would issue to Plaintiff the Escrow Shares and deposit them in Supreme's bank account, and then refusing to do so, Defendant PMAG (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff, directed against it in the United States, in an effort to induce Plaintiff not to purse action in Germany and to cease its request for entry in the share register as owner of the Escrow Shares, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendant PMAG is sued as primary participant in the wrongful and illegal conduct charged herein.

72.     Defendant PMAG, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

continuous course of conduct where PMAG misled Plaintiff regarding entering Plaintiff on its share register as the owner of the Escrow Shares, as specified above.  Defendant PMAG employed devices, schemes and artifices to defraud, while in possession of material adverse information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure Plaintiff that it had agreed that it would register as the owner of the Escrow Shares. This course of action operated as a fraud and deceit upon Plaintiff and caused Plaintiff to enter into the Escrow Share Sale Agreement.

73.    Defendant PMAG had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that it failed to ascertain and disclose such facts, even though such facts were readily available to it.   Such material misrepresentations and omissions were done knowingly and or recklessly and for the purpose and effect of preventing the registration of the Escrow Shares in Plaintiff's name to (a) avoid a lawsuit against PMAG and the Membership Board Defendants and the Advisory Board Defendants and (b) keep the Escrow Shares in the name of Champlain.

74.    The Membership Board Defendants and the Advisory Board Defendants, as the persons responsible for the management of Defendant PMAG had actual knowledge of the acts set forth in Paragraphs 69-73, above.  The Membership Board Defendants and the Advisory Board Defendants aided and abetted Defendant PMAG in disseminating materially false and misleading information and failing to disclose material facts to Plaintiff.  The Membership Board Defendants and the Advisory Board Defendants materially benefitted from Defendant PMAG's dissemination of materially false and misleading information and its failing to disclose material facts to the Plaintiff.

75.     As a result of Defendant PMAG's dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, Plaintiffs were damaged because they have been denied ownership of the Escrow Shares and more specifically the profit of the sale of the Escrow Shares under the Escrow Share Sale Agreement.

76.     At the time of said misrepresentations and omissions, Plaintiff was unaware of their falsity, and believed them to be true.  Had Plaintiff known that Defendants intended to deny Plaintiff's ownership of the Escrow Shares, Plaintiff would have (a) initiated a lawsuit against Defendants in Germany in the summer of 2020 while the Escrow Shares were still in "suspense" and (b) would not have entered into the Escrow Shares Sale Agreement creating a legal obligation that Plaintiff cannot fulfil.

77.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

78.     As a direct and proximate result of Defendants illegal and wrongful conduct, Plaintiff suffered damages in connection with their purchase and sale of the Escrow Shares.

## COUNT II

## VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
(Asserted Directly by Plaintiff against the Management Board Defendants
and the Advisory Board Defendants)

79.     Plaintiff realleges and incorporates herein Paragraphs 1 through 78 of this Complaint as if fully set forth herein.

80.     The Management Board Defendants and the Advisory Board Defendants were and acted as "controlling persons" of Defendant PMAG within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions within Defendant PMAG, participation and/or awareness of Defendant PMAG's operations and/or intimate knowledge of the Defendant

PMAG's actual performance, the Management Board Defendants and the Advisory Board Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Defendant PMAG, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

81.     In addition, the Management Board Defendants and the Advisory Board Defendants had direct involvement in the day-to-day operations of Defendant PMAG, and, thus, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

82.     By virtue of their controlling position, the Management Board Defendants and the Advisory Board Defendants are liable pursuant to Section 20(a) of the Exchange Act.

83.     As a direct and proximate result of the Management Board Defendants and the Advisory Board Defendants wrongful conduct, Plaintiffs suffered damages in connection with their purchase and ownership of the Escrow Shares.

## COUNT III

### TORTIOUS INTERFERENCE WITH CONTRACT RIGHTS
(Direct Cause of Action against all Defendants for Tortious Interference
in Plaintiff's Contract with Supreme)

84.     Plaintiff realleges and incorporates herein Paragraphs 1 through 68 of this Complaint as if fully set forth herein, except that for purposes of this Count.

85.     The Escrow Shares Sale Agreement was a valid contract that obligated Plaintiff to sell the Escrow Shares to Supreme and obligated Supreme to pay 6,800,000 euros for them.

86.     Defendant PMAG knew of the Escrow Shares Sale Agreement because Plaintiff has specifically provided a copy to its attorneys by email.  The Management Board Defendants

and the Advisory Board Defendants knew or should have known of the Escrow Shares Sale Agreement as part of their duties for Defendant PMAG.

87.    Defendant PMAG acted intentionally and improperly to renege on its agreement to register the Escrow Shares in the name of a buyer, and deposit the Escrow Shares in the buyer's account, as instructed by Plaintiff.

88.    The Management Board Defendants and the Advisory Board Defendants acted intentionally and improperly to cause Defendant PMAG to renege on its agreement to register the Escrow Shares in the name of a buyer, and deposit the Escrow Shares in the buyer's account, as instructed by Plaintiff.

89.    As a result, all Defendants intentionally and improperly placed Plaintiff in a position where it was in breach of Escrow Share Sale Agreement and has not been able to sell the Escrow Shares to Supreme.

90.    As a direct result of Defendants' actions, Plaintiff suffered damages in the amount of 4,441,750 euros, which is the difference between the sale price of 6,800,000 euros in the Escrow Share Sale Agreement and the cost of the Escrow Shares, which is the 2,358,250 euros that was not paid by Champlain.

### COUNT IV

### BREACH OF CONTRACT
(Direct Cause of Action against Defendant PMAG
for Breach of its Agreements with Plaintiff)

91.    Plaintiff realleges and incorporates herein Paragraphs 1 through 68 of this Complaint as if fully set forth herein.

92.    Defendant PMAG's communication with Plaintiff on August 14, 2020, as set forth in Paragraph 55, above, was a contract between Plaintiff and Defendant PMAG.  Plaintiff

had already threatened legal action and Defendant PMAG.  In return for the consideration of Plaintiff not filing the lawsuit, Defendant PMAG agreed to register the Escrow Shares in Plaintiff's name and deposit the Escrow Shares in Plaintiff's account to prevent the filing of a lawsuit.

93.     When Plaintiff was unable to find a bank account to hold PMAG's uncertificated shares, Plaintiff reasonably and foreseeably relied on Defendant PMAG's explicit promise that (a) Plaintiff had title to the Escrow Shares and (b) Plaintiff could sell the Escrow Shares and that Defendant PMAG would directly register the Escrow Shares in the buyer's name and deposit the Escrow Shares directly in the buyer's bank account.

94.     Defendant PMAG's failure to fulfill its obligations in either (a) registering the Escrow Shares in Plaintiff's name and deposit the Escrow Shares in Plaintiff's account or, alternatively, (b) registering the Escrow Shares in the buyer's (i.e. Supreme's) name and depositing the Escrow Shares directly in the buyer's (i.e. Supreme's) bank account was a breach of contract.

95.     As a direct, proximate and foreseeable result of Defendant PMAG's failure to fulfill its obligations under both the August 14th agreement and its subsequent agreement to allow Plaintiff to transfer the Escrow Shares to Supreme, Plaintiff suffered damages in the amount of 4,441,750 euros, which is the difference between the sale price of 6,800,000 euros in the Escrow Share Sale Agreement and the cost of the Escrow Shares, which is the 2,358,250 euros that was not paid by Champlain.

**COUNT V**

**TORTIOUS INTERFERENCE WITH CONTRACT RIGHTS**
(Direct Cause of Action against the Management Board Defendants
and the Advisory Board Defendants for Tortious Interference
in Plaintiff's Contract with Defendant PMAG)

96.     Plaintiff realleges and incorporates herein Paragraphs 1 through 68 and 91 through 95 of this Complaint as if fully set forth herein.

97.     By virtue of their high-level positions within Defendant PMAG, participation and/or awareness of Defendant PMAG's operations and/or intimate knowledge of the Defendant PMAG's actual performance, the Management Board Defendants and the Advisory Board Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Defendant PMAG.

98.     The Management Board Defendants and the Advisory Board Defendants intentionally and knowingly reversed their communicated position where they had instructed Defendant PMAG to promise that it would allow either (a) the registering of the Escrow Shares in Plaintiff's name and the depositing of them in Plaintiff's account or, alternatively, (b) the registering of the Escrow Shares in the buyer's (i.e. Supreme's) name and the depositing of the Escrow Shares directly in the buyer's (i.e. Supreme's) bank account.

99.     The Management Board Defendants and the Advisory Board Defendants knew that their actions would result in Defendant PMAG breaching its contract with Plaintiff and also knew that, as a direct, proximate and foreseeable result of Defendant PMAG's failure to fulfill its contract with Plaintiff, Plaintiff would suffer damages.

100.    As a direct, proximate and foreseeable result of the Management Board Defendants' and the Advisory Board Defendants' actions as set forth in paragraphs 96-99, above, Plaintiff suffered damages in the amount of 4,441,750 euros, which is the difference between the

sale price of 6,800,000 euros in the Escrow Share Sale Agreement and the cost of the Escrow Shares, which is the 2,358,250 euros that was not paid by Champlain.

## COUNT VI

### TORTIOUS INTERFERENCE WITH CONTRACT RIGHTS
(Direct Cause of Action against all Defendants for Tortious Interference
in Plaintiff's SPA with Champlain)

101.    Plaintiff realleges and incorporates herein Paragraphs 1 through 68 of this Complaint as if fully set forth herein.

102.    The SPA was a valid contract whereby Plaintiff agreed to sell Champlain 18,866 shares of PMAG in exchange for a payment of 2,358,250 euros.

103.    Defendants were given a true and correct copy of the SPA and the Escrow Agreement as early as December 2019.  At the same time, Defendants were made aware that Champlain had never paid Plaintiff the 2,358,250 euros (nor had offered to pay the 2,358,250 euros).

104.    Because of the mechanics of the SPA and the Escrow Agreement, the Escrow Shares effectively contain the 18,866 shares that were transferred under the SPA and were not paid for. (i.e. under the SPA, Plaintiff transferred 18,866 shares to Champlain for payment and was left with 0 shares and a credit of 2,358,250 euros.  If the payment is not made 6 months later, Champlain forfeits the 68,000 Escrow Shares under the Escrow Agreement.  Effectively, Plaintiff gets the original 18,866 shares back plus 49,134 additional shares and waives its right to the 2,358,250 euros).

105.    Nevertheless, Defendants, in 2021 (as set forth in paragraphs 67 and 68), transferred (or caused Defendant PMAG to transfer) all of the Escrow Shares to Champlain, which includes the 18,866 shares that were transferred under the SPA and were not paid for.

106.    Defendants' action (as described in paragraph 105, above) left Plaintiff without either the 18,866 shares that it had prior to entering into the SPA, or the payment of 2,358,250 euros.

107.    Defendants' action (as described in paragraph 105, above), at the urging of Champlain, had the result of relieving Champlain from its contractual obligation to pay for the 18,866 shares, i.e. to perform its obligations under the SPA, because Defendants have simply given Champlain these shares for free.

108.    Defendants' action (as described in paragraphs 101 through 107, above) is tortious interference in the SPA.

109.    As a result of Defendants' action (as described in in paragraphs 101 through 107, above), Plaintiff has suffered damages in the amount of 2,358,250 euros.

## COUNT VII

## CONVERSION
(Direct Cause of Action against all Defendants)

110.    Plaintiff realleges and incorporates herein Paragraphs 1 through 68 of this Complaint as if fully set forth herein.

111.    Defendants acknowledged, on August 14, 2020, that Plaintiff had title to the Escrow Shares, i.e. that the Escrow Shares were Plaintiff's property.

112.    Defendants transferred Plaintiff's property, i.e. the Escrow Shares, to Champlain, thus wrongfully denying Plaintiff of its property.

113.    Plaintiff has made demand for the Escrow Shares and Defendants have refused to return them.

114.    Plaintiff has suffered economic loss as a result of Defendants' action as set forth in paragraphs 114 through 117, above.

23

115.    Plaintiff damages, as set forth in paragraph 118, is the amount of 4,441,750 euros, which is the net profit to Plaintiff of the fair market value of the Escrow Shares as determined under the Escrow Share Sales Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

A.    Demand judgment under:

    i.    Counts I and II for money damages in excess of $75,000, exclusive of interest and costs.

    ii.    Counts III, IV, V and VII for money damages in in the amount of 4,441,750 euros, exclusive of interest and costs.

    iii.    Count VI for money damages in in the amount of 2,358,250 euros, exclusive of interest and costs.

B.    Demand judgment for punitive damages, reasonable attorneys' fees, costs and disbursements of this action, and prejudgment interest.

C.    Request such other and further relief as this Court deems equitable and just.

Respectfully submitted.

Dated: March 22, 2021

**/s/Adam Kravitz**
Adam Kravitz (Florida Bar No. 987425)
Attorney E-mail: adam@kravitzco.com
KRAVITZ & CO., P.A.
121 Alhambra Plaza, 10th Floor
Coral Gables, FL 33134
Telephone: (305) 335-0330
Facsimile:   (305) 716-9174
*Attorneys for Plaintiff Sturmanskie LLC*

## <u>VERIFICATION</u>

The undersigned declares that he has read the foregoing Complaint and verifies that the

factual allegations contained therein are true, correct and accurate to the best of my knowledge.

Sturmanskie LLC

By:_____

Adam Kravitz, Manager