## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

STURMANSKIE LLC;

       Plaintiff,

v.

PICTUREMAXX AG, GERHARD FEIGL,
MARCIN CZYZEWSKI, MATTHIAS
DITTLER, THOMAS KIESSL, ALEXANDER
RÜEGG,

       Defendants.

_____/

Case No.   1:21-cv-21091-JEM

**FIRST AMENDED COMPLAINT**

Plaintiff, STURMANSKIE LLC, by and through its undersigned counsel, hereby files its *First Amended Complaint*, under Fed. R. Civ. P. 15(a)(1)(B), against PICTUREMAXX AG, GERHARD FEIGL, MARCIN CZYZEWSKI, MATTHIAS DITTLER, THOMAS KIESSL, and ALEXANDER RÜEGG and alleges as follows:

## INTRODUCTION

1.     This is an action for, *inter alia*, securities fraud, tortious interference in contract rights and a business relationship, conversion, and civil conspiracy, arising out of (a) Defendants' fraudulent and tortious conduct in relation to the sale of securities of Defendant PICTUREMAXX AG ("PMAG") by Plaintiff to Supreme Asset AG, a Swiss company, ("Supreme"); (b) Defendants' tortious interference with Plaintiff's contract and business relationship with Champlain Holding, S.A., a Panamanian company ("Champlain"); (c) Defendants' tortious interference with Plaintiff's contract with Supreme, (d) Defendants' conversion of the Escrow Shares (as defined below), and

(e) Defendants' civil conspiracy with Champlain to commit torts against the Plaintiff, all of which caused injury to the Plaintiff in Florida.

2.     Plaintiff is a Delaware limited liability company, whose sole manager is Adam Kravitz, a Miami-Dade County, Florida, resident (the "Manager").

3.     In April 2018, Plaintiff was the owner of 18,866 shares of PMAG common stock. These were in the form of uncertificated bearer shares, which is permissible under German law.

4.     On April 24, 2018, Plaintiff entered into a share purchase agreement (the "SPA") to sell its 18,866 shares to a third party, Champlain, for 125 euros per share, an aggregate amount of 2,358,250 euros.

5.     The place of payment of the purchase price for the SPA is Plaintiff's counsel's Florida IOTA account located in Miami-Dade County, Florida (the "Florida Account") (The Florida Account is located at a Miami-Dade County branch of BB&T [now Truist] and is governed by the IOTA rules of the Florida Bar, although BB&T's head office is in North Carolina).

6.     At the time, Champlain did not have the funds to complete the purchase.  Therefore, the SPA specified that Champlain would make the payment of 2,358,250 euros in full by September 30, 2018.

7.     Champlain's Swiss lawyers, Barandun von Graffenried, proposed that, as security for the performance of Champlain's payment obligation, Champlain would execute a notarized acknowledgment of transfer for 68,000 shares of PMAG to Plaintiff (the "Escrow Shares").

8.     Because PMAG's shares are uncertificated bearer shares, an accepted way to show a transfer of such shares in Germany is for the transferee to execute, before a notary (or consular official), an acknowledgement of the transfer to the transferee.

9.      Plaintiff accepted a notarized acknowledgment of transfer transferring the Escrow Shares to Plaintiff as acceptable security for the payment of the purchase price, both parties taking into account the significant risks attendant in taking the Escrow Shares as sole security.

10.      The terms of the escrow of the Escrow Shares were governed by an escrow agreement between Plaintiff, Champlain, and Kravitz & Co. PA ("K&Co"), a Coral Gables, Florida, law firm, governed by Florida law where the parties had agreed to exclusive jurisdiction in Miami-Dade County, Florida (the "Escrow Agreement").

11.      Champlain executed a notarized acknowledgment of transfer for 68,000 shares of PMAG to Plaintiff in Panama (executed by its directors) and delivered the original notarized acknowledgment of transfer, together with an authorizing board resolution, the executed SPA, and the executed Escrow Agreement to Barandun von Graffenried. At closing, Plaintiff executed the SPA and Escrow Agreement and delivered to Champlain a notarized acknowledgment of transfer (done at the German Consulate in Miami), in the form specified in the SPA, evidencing the transfer of the 18,866 shares of PMAG to Champlain.

12.      In return, Champlain, through Barandun von Graffenried, delivered to K&Co the notarized acknowledgment of transfer for the Escrow Shares to hold in escrow.

13.      On September 30, 2018, Champlain failed to make the payment of 2,358,250 euros to the Plaintiff at the Florida Account (or anywhere else).  As a result, Plaintiff informed Champlain that it was requesting the notarized acknowledgment of transfer from K&Co for the Escrow Shares under the terms of the Escrow Agreement (giving the 10 days' notice required under the Escrow Agreement).

14.     At the conclusion of the 10-day notice period, K&Co delivered the notarized acknowledgment of transfer for the Escrow Shares to Plaintiff, thus transferring ownership of the Escrow Shares to Plaintiff as a result of Champlain's non-payment of the purchase price.

15.     Thereafter, for approximately one year, Plaintiff, through its counsel K&Co, made repeated proposals to Champlain in an attempt to get Champlain to pay the amount due of 2,358,250 euros in exchange for a return of the Escrow Shares.  However, the attempts were unsuccessful, and Plaintiff finally decided to register the transfer of Escrow Shares from Champlain to Plaintiff with PMAG.

16.     On December 5, 2019, Plaintiff, through its counsel K&Co and its Manager contacted Defendant PMAG to register the Escrow Shares on Defendant PMAG's books and records in Plaintiff's name.

17.     These contacts were made by K&Co and the Manager from Florida by email from an address in Florida clearly identified on the email. Ultimately, this initial correspondence consisted of at least five email exchanges with Defendant PMAG plus one telephone conference with Plaintiff in Florida.

18.     At first, Defendant PMAG refused to register the shares, claiming that it had no knowledge of the situation.

19.     Prior to Plaintiff's contact with Defendant PMAG, Defendant PMAG had begun the process of registering (on its shareholder register) its previously unregistered bearer shares. The status of the Escrow Shares was that they were held, effectively in "suspense", in the name of a neutral German bank, along with other bearer shares that had not yet been registered.

20.     Defendant PMAG, through its officers and Management Board ("*Vorstand*") members (Defendants GERHARD FEIGL ("GF"), its CEO and MARCIN CZYZEWSKI ("MC"),

its CTO), requested from Plaintiff, via communications to Florida, documents, and other things which PMAG said it required in order for Plaintiff to demonstrate its ownership of the Escrow Shares.

21.     As part of their determination of the ownership of the Escrow Shares, Defendants contacted Champlain, having refused to pay the purchase price for the 18,866 shares under the SPA, now denied that Plaintiff was the rightful owner of the Escrow Shares.  Champlain, through its new attorneys, put forward several completely spurious claims, including (a) denying the transaction ever took place, (b) questioning whether Plaintiff was in possession of the original notarized acknowledgment of transfer for the transfer of the Escrow Shares, and (c) questioning whether Plaintiff's Manager and law firm actually acted for it.

22.     Plaintiff, through its Manager in Florida, provided PMAG with incontrovertible documentary proof, consisting of the notarized acknowledgment of transfers and contracts proving the chain of title and its right to ownership of the Escrow Shares.

23.     Specifically, on July 7, 2020, Champlain asserted that the SPA was null and void because the Escrow Shares were "over-securitization" under Swiss law. Plaintiff strenuously refuted this argument. However, if this were true, Plaintiff would then have still retained ownership of the original 18,866 shares of PMAG.

24.     Beginning in the Spring of 2020 and culminating in the beginning of August 2020, Plaintiff engaged German law firms and drafted a complaint to be filed in Munich, Germany. Plaintiff communicated this draft complaint to Defendant PMAG in early August 2020.

25.     On August 26, 2020, Defendant PMAG informed Plaintiff by email and telephone (a) that it had determined that Plaintiff was the owner of the Escrow Shares, (b) that Champlain's objections did not have any merit, and (c) that it would register the Escrow Shares in Plaintiff's

name. Defendant PMAG specifically stated that this action was determined by both its Management Board and its Supervisory Board ("*Aufsichtsrat*") members (Defendants MATTHIAS DITTLER ("MD"), THOMAS KIESSL ("TK"); and ALEXANDER RÜEGG ("AR")).

26. Plaintiff was informed by Defendant PMAG that the status of the registration of the Escrow Shares was that they were under the control of Defendant PMAG as part of the process of converting the bearer shares to registered shares. Shares which were awaiting registration by their owners were being held by Defendant PMAG at a German bank. In order to perform the administrative act of registering the Escrow Shares in Plaintiff's name, Defendant PMAG's share transfer agent, Computershare, required that Plaintiff open a bank account where Computershare could deposit the uncertificated Escrow Shares belonging to Plaintiff.

27. Plaintiff was unable to open a bank account which could hold the Escrow Shares because (a) European banks contacted by Plaintiff, which are capable of holding uncertificated shares in unlisted German public companies, would not open a bank account for a U.S. company because of U.S. securities and banking laws (i.e. FATCA) and (b) U.S. banks (or broker-dealers) would open an account for Plaintiff, but would not hold uncertificated shares in unlisted German public companies.

28. Defendants were aware that Plaintiff was an American company and acknowledged the difficulty that Plaintiff would have in opening a deposit account to hold the Escrow Shares.

29. Plaintiff requested assistance from Defendant PMAG, specifically to ensure that Computershare registered the Escrow Shares in Plaintiff's name on Defendant PMAG's books and records while Plaintiff was attempting to open a suitable bank or brokerage account. However, Defendant PMAG refused to do so.

30.     As a result of Defendant's refusal to register the Escrow Shares in Plaintiff's name without also depositing them in Plaintiff's account (based on their representation that the share register was electronic), Plaintiff was forced to sell its shares to a third party as the only solution.

31.     Plaintiff identified a buyer (Supreme) and entered into a contract whereby it would sell Supreme (a Swiss company that did not have an issue depositing uncertificated shares in unlisted German public companies in its bank accounts) the Escrow Shares for an aggregate amount of 6,800,000 euros (the "Escrow Share Sale Agreement").

32.     The place of payment of the purchase price of the Escrow Share Sale Agreement is specifically the Florida Account.  Plaintiff was to receive the benefit of the Escrow Share Sale Agreement in Florida.

33.     Prior to entering into the Escrow Share Sale Agreement, Plaintiff, through its German lawyer, contacted Defendant PMAG to ensure that the form of the Escrow Share Sale Agreement was acceptable to Defendant PMAG and that Defendant PMAG would register the Escrow Shares in the buyer's name.  Plaintiff made this request because it did not want any further administrative problems.

34.     Defendant PMAG responded to Plaintiff that it could proceed with the share sale and therefore, Plaintiff, in Florida through its Manager, executed the Escrow Share Sale Agreement with the buyer.

35.     Plaintiff sent the executed Escrow Share Sale Agreement on December 1, 2020, with a request to transfer the Escrow Shares to the buyer, as promised.  After not responding for over a week, Defendant PMAG informed Plaintiff that its Management Board and Supervisory Boards would not deposit the Escrow Shares in Supreme's account.

36.     As a result, Plaintiff was unable to conclude the transaction in the executed Escrow Share Sale Agreement, was placed in breach of that agreement, and did not receive the sale proceeds in the Florida Account from Supreme.

37.     Subsequently, in March 2021, while negotiating with Defendants to get Defendant PMAG to instruct Computershare to transfer the Escrow shares to Supreme, Plaintiff learned that Defendant PMAG had, instead, transferred them to the control of Champlain, thus leaving Plaintiff without either:

    a.      its original 18,866 shares of PMAG;

    b.      the 2,358,250 euros it sold them to Champlain for; or

    c.      the Escrow Shares that were supposed to be the security for the payment by Champlain.

## THE PARTIES

38.     Plaintiff STURMANSKIE LLC is a limited liability company organized and in good standing under the laws of the State of Delaware, with its registered office at 3411 Silverside Road, Tatnall Building #104, Wilmington, Delaware 19810.  At all times relevant to this action, Plaintiff acted solely through its Manager, Adam Kravitz, or its counsel, Kravitz & Co. PA, both located in Miami-Dade County, Florida.

39.     Defendant PICTUREMAXX AG is an *Aktiengesellschaft* (joint stock company) organized and existing under the laws of the Federal Republic of Germany with its registered address at Stefan-George-Ring 2, 81929 Munich, Germany.

40.     Under German company law, an *Aktiengesellschaft* has a two-tier board system.  A Supervisory Board, called an *Aufsichtsrat*, which is elected by the shareholders and appoints the members of the Management Board (called the *Vorstand*) and must approve major corporate

8

decisions.  In this case, all decisions regarding the registration of the Escrow Shares were made by both the Supervisory Board and the Management Board.

41.     Defendant GERHARD FEIGL ("GF") is an individual and a citizen of the Federal Republic of Germany.  GF resides at Friedastrasse 1a, 81479 Munich, Germany.  GF is a member of the Management Board.

42.     Defendant MARCIN CZYZEWSKI ("MC") is an individual and a citizen of the Federal Republic of Germany.  MC resides at Georg-Kerschensteiner-Strasse 33a, 81829 Munich, Germany. MC is a member of the Management Board.

43.     Defendant MATTHIAS DITTLER ("MD") is an individual and a citizen of Switzerland.  MD resides at Gersauerstrasse 17, 6440 Brunnen, Switzerland. MD is a member of the Supervisory Board.

44.     Defendant THOMAS KIESSL ("TK") is an individual and a citizen of the Federal Republic of Germany.  TK resides at Kurfürstenstrasse 23, 80801 Munich, Germany. TK is a member of the Supervisory Board.

45.     Defendant ALEXANDER RÜEGG ("AR") is an individual and a citizen of Switzerland.  AR resides at An der Lorze 17, 6300 Zug, Switzerland.  AR is a member of the Supervisory Board.

JURISDICTON AND VENUE

46.     This Court has subject matter jurisdiction as this action is brought pursuant to Sections 10(b) of the Securities and Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5).

47.     This Court's jurisdiction over Defendant PMAG in Count I is expressly conferred pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v), specifically 15 U.S.C. § 77v(c)(2)

which states that "*conduct occurring outside the United States that has a foreseeable substantial effect within the United States*".  The specific foreseeable substantial effects within the United States are:

    a.    As a result of Plaintiff's reliance on Defendants' representation that Plaintiff owned the Escrow Shares, Plaintiff executed the Escrow Share Purchase Agreement in Florida.

    b.    As a result of Plaintiff's reliance on Defendants' representation that Plaintiff owned the Escrow Shares, Plaintiff was injured in Florida because Plaintiff did not receive payment for the Escrow Shares under the Escrow Share Purchase Agreement in the Florida Account.

48.    This Court's jurisdiction over Defendants is expressly conferred pursuant to 28 U.S.C. §§ 1331 and 1337.  This Court has supplemental jurisdiction over all of the pendent state law claims in accordance with 28 U.S.C. §1367.

49.    Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332. Plaintiff is a Delaware limited liability company which at all times herein acted solely through its Manager and legal counsel which are located in Florida. All defendants are foreign corporations or individuals located in the Federal Republic of Germany or Switzerland. None of the defendants are lawfully admitted for permanent residence in the United States or are domiciled in the United States.  The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000. Therefore, specifically under 28 U.S.C. § 1332(a)(2), this Court has subject matter jurisdiction in this action.

50.    This Court has *in personam* jurisdiction over all Defendants under the "Florida Long-Arm Statute" Fla. Stat. §48.193.  Specifically, under Fla. Stat. §48.193(1)(a)(2) Defendants

have committed tortious acts in Florida.  Furthermore, Defendants were aware that Plaintiff would be injured in Florida and were notified that their actions, should they continue to proceed would subject them to the jurisdiction of courts in the United States.  The tortious acts in Florida are:

b.      For Defendant PMAG, sending emails and making telephonic statements to Plaintiff's counsel and Manager, who were and whom Defendant PMAG knew to be Florida residents, and which contained fraudulent statements or omissions of fact that caused Plaintiff to act in Florida in reliance on those statements.

c.      For Defendant PMAG, taking an action in Germany (the transfer of the Escrow Shares to Champlain) which caused specific and foreseeable injury to Plaintiff in Florida.  Due to Defendant PMAG's action Plaintiff will not receive, in Florida, in the Florida Account, either: (i) the purchase price for the Escrow Shares, or (ii) the purchase price for the 18,866 shares under the SPA.

d.      For Defendant PMAG, taking an action in Germany (refusing to deposit the Escrow Shares in Supreme's account) which caused specific and foreseeable injury to Plaintiff in Florida.  Due to Defendant PMAG's action, Plaintiff will not receive, in Florida, in the Florida Account, the purchase price for the Escrow Shares.

e.      For the Management Board Defendants and the Advisory Board Defendants (as defined below), taking action in Germany and Switzerland in causing Defendant PMAG to (a) transfer of the Escrow Shares to Champlain (b) refuse to deposit the Escrow Shares in Supreme's account on Plaintiff's

instructions.   These actions caused specific and foreseeable injury to Plaintiff in Florida.  Due to Defendant's action, Plaintiff will not receive, in Florida in the Florida Account, either: (i) the purchase price for the Escrow Shares, or (ii) the purchase price for the 18,866 shares under the SPA.

51.      Venue is properly laid in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. §1391(b) and (c).  The acts and conduct complained of herein, including the intended receipt of email and telephonic communications and tortious acts, as well as the issuance and dissemination of materially false and misleading information to Plaintiff, occurred in substantial part in this District.  In connection with the acts and conduct alleged in this First Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including email and telephonic communications. Furthermore, all defendants reside outside of the United States and, therefore, venue in any Federal District Court is proper.

52.      All conditions precedent to the initiation and maintenance of this action have been performed or have occurred.

## FACTS COMMON TO ALL COUNTS

53.      Plaintiff is a Delaware limited liability company.  At all times relevant to the facts set forth in this Complaint, Plaintiff acted through its sole Manager, Adam Kravitz ("Manager") a Florida resident, and its counsel, Kravitz & Co., PA, a Florida law firm ("K&Co"). Both the Manager and K&Co are located in Miami-Dade County, Florida.  Plaintiff's sole operation as a business was through its sole Manager and was wholly within the State of Florida.

54.      In April 2018, Plaintiff was the owner of 18,866 shares of PMAG common stock. Under the German Stock Corporation Act, which governs the formation and organization of

12

*Aktiengesellschaft*, it is possible to issue shares in the form of uncertificated bearer shares. This means that the owner of the shares must prove themselves through chains of title, including contracts, bills of sale or acknowledgments of transfer. Plaintiff had purchased the 18,866 shares from a third party and possessed the contract and an acknowledgement of the transfer of these shares into its name which had been legalized at the German consulate in Miami.

55. On April 24, 2018, Plaintiff entered into a share purchase agreement (the "SPA") to sell the 18,866 shares to, Champlain Holding, S.A., a Panamanian company ("Champlain"), for 125 euros per share, an aggregate amount of 2,358,250 euros.

56. Champlain did not have the funds to complete the purchase at the time. However, Champlain, though its counsel, Michael Hess ("Hess"), a lawyer with the firm Barandun von Graffenried ("BvG"), in Zurich, Switzerland, stated that it wished to take possession of the shares immediately as there was an upcoming PMAG shareholders meeting in late May 2018. These negotiations took place between BvG and the Manager and K&Co primarily via email, with the Manager and K&Co located in Florida.

57. The resulting SPA specified that Champlain would make the payment of 2,358,250 euros in full by September 30, 2018. However, Champlain would immediately receive an acknowledgement of transfer, legalized at the German consulate in Miami, evidencing the transfer of the 18,866 shares of PMAG to Champlain. As security for Champlain's performance of its payment obligations under the SPA (and the "Frame Agreement" referenced therein), which were due in the Florida Account, Champlain would deliver to K&Co in Florida, as an escrow agent, a notarized acknowledgement of transfer for 68,000 shares of PMAG (the "Escrow Shares") from Champlain to Plaintiff.

58.     The terms of the escrow of the Escrow Shares were governed by an escrow agreement between Plaintiff, Champlain and K&Co governed by Florida law where the parties had agreed to exclusive jurisdiction in Miami-Dade County, Florida.

59.     On May 24, 2018, pursuant to the SPA, Plaintiff delivered the original acknowledgement of transfer, legalized at the German consulate in Miami, evidencing the transfer of the 18,866 shares of PMAG to Champlain.

60.     In return, BvG delivered to K&Co in Florida, for holding in escrow, an original acknowledgement of transfer for the Escrow Shares, which was executed by Champlain and notarized and apostilled in Panama.

61.     On September 30, 2018, Champlain failed to make the payment of 2,358,250 euros. Therefore, Plaintiff informed Champlain by email that it had requested, from K&Co, possession of the original acknowledgement of sale for the Escrow Shares as Plaintiff was entitled to do under the terms of the escrow agreement.  Several emails were exchanged between BvG and K&Co and Champlain did not either (a) deny that the payment of 2,358,250 euros was due, or (b) pay the payment of 2,358,250 euros to Plaintiff.  When informed by K&Co that it was delivering to Plaintiff the original notarized acknowledgement of transfer for the Escrow Shares, after the 10-day notification period specified in the Escrow Agreement, neither Champlain nor BvG objected.

62.     The delivery from K&Co to Plaintiff of the original notarized acknowledgement of transfer for the Escrow Shares was done in Florida.  Plaintiff continues to hold the original notarized acknowledgement of transfer for the Escrow Shares in Miami-Dade County, Florida.

63.     Despite the delivery to Plaintiff of the original notarized acknowledgement of transfer for the Escrow Shares, Plaintiff, through K&Co. continued to make repeated proposals to Champlain in an attempt to get Champlain to pay the amount due of 2,358,250 euros in exchange

for the return of the Escrow Shares.  These attempts took place over the period from October 2018 until November 2019.

64.    However, the attempts were unsuccessful. Therefore, Plaintiff decided to register the Escrow Shares on the share register of PMAG because Plaintiff had learned sometime in mid-2019 that PMAG was creating a share register with the goal of registering all of the bearer shares.

65.    On December 5, 2019, Plaintiff, through its counsel K&Co. contacted Defendant PMAG to register the Escrow Shares on Defendant PMAG's books and records in Plaintiff's name. At first, Defendant PMAG refused to register the shares, claiming that it had no knowledge of the situation.

66.    Defendant PMAG, through its officers and Management Board ("*Vorstand*") members (Defendants GERHARD FEIGL ("GF"), its CEO and MARCIN CZYZEWSKI ("MC"), its CTO) (collectively the "Management Board Defendants"), and by its Supervisory Board ("*Aufsichtsrat*") members (Defendants MATTHIAS DITTLER ("MD"), THOMAS KIESSL ("TK"); and ALEXANDER RÜEGG ("AR") (collectively the "Advisory Board Defendants")) requested substantial documentation from Plaintiff in Florida in order for Plaintiff to demonstrate its ownership of the Escrow Shares.

67.    Defendants requested excessive documentation and created difficulty because Defendants preferred that Champlain would be the owner of the Escrow Shares and believed that if they created enough hurdles for Plaintiff, Plaintiff would simply walk away from the transaction.

68.    Plaintiff, at significant expense, including the production of notarized and apostilled documents, complied with Defendant PMAG's requests.  In addition, Plaintiff was forced to engage lawyers in Germany and ultimately threatened a lawsuit in Germany.

69.     On August 26, 2020, in order to avoid the lawsuit, Defendant PMAG informed Plaintiff that it recognized Plaintiff as the owner of the Escrow Shares (although written in somewhat formal and passive German, i.e. "*our client can reasonably assume that your client has become the owner of 68,000 shares of picturemaxx AG*" and "*Now that notarized copies have been submitted, our client supposes it can assume the ownership rights of Sturmanskie LLC without violating its duties*", the statements contained in this email establish that, as against Defendant PMAG, Plaintiff was the owner of the Escrow Shares). (the "August 26th Email" attached as Exhibit "A").

70.     Defendant PMAG admitted in the August 26th Email that its determination of Plaintiff's ownership of the Escrow Shares was as a result of its own "*intensive assessment*" of the documentation presented by Plaintiff.

71.     **As a result** of that determination, the August 26th Email went on to say that Defendant PMAG would permit registration of Plaintiff's name in the Share Register by its external transfer agent, Computershare ("***Therefore***, *our client no longer has any objections…*" [emphasis added]).

72.     In a subsequent phone call with Plaintiff's German counsel, Defendant PMAG noted that this action was decided by the Management Board Defendants and the Advisory Board Defendants as a corporate action.

73.     Defendant PMAG's recognition of Plaintiff's ownership of the Escrow Shares was final, determinative, and unconditional, specifically in relation to Defendant PMAG itself, and was the result of an official corporate action made by the Management Board Defendants and the Advisory Board Defendants

16

74.     However, in order to for Plaintiff to register its ownership of the Escrow Shares in its name, it was necessary for Plaintiff open a bank account where Computershare could deposit the Escrow Shares, which, while now registered (as opposed to "bearer"), were still in "uncertificated" form.

75.     Registration was not a condition precedent to Defendants' acknowledgment of Plaintiff's ownership of the Escrow Shares, it was the result of that acknowledgement.  For example, there was no requirement that Plaintiff had to register the original 18,866 shares to sell them to Champlain in the SPA.

76.     Plaintiff was not given a time limit to register the Escrow Shares, nor was Plaintiff informed that if it did not register the Escrow Shares that it would risk losing ownership of them to any other party.  To the contrary, Plaintiff was told that the Escrow Shares were part of a pool of un-registered shares held at a neutral German bank in an account controlled by Defendant PMAG (or its agent, Computershare) awaiting registration by their owners, which in the case of the Escrow Shares was Plaintiff. The registration of Plaintiff's name in Defendant PMAG's share register was ultimately an act wholly within the control of Defendant PMAG, which had been outsourced to an external transfer agent (Computershare).

77.     Furthermore, the only consequence of failure to register the Escrow Shares, which Plaintiff was informed of by Defendant PMAG, was that it would not receive notices and would not be able to participate in shareholders' meetings.  However, Defendant PMAG did allow Plaintiff to attend its shareholders' meeting on September 2, 2020, in recognition of Plaintiff's ownership of the Escrow Shares.

78.     Plaintiff was unable to open a bank account which could hold the Escrow Shares. Because of tightening of anti-money laundering and tax avoidance provisions (i.e. FATCA),

through no fault of Plaintiff's own, (a) European banks contacted by Plaintiff, which are capable of holding uncertificated shares in unlisted German public companies, would not open a bank account for a U.S. company citing U.S. securities and banking laws and (b) U.S. banks (or broker-dealers) would open an account, but would not hold uncertificated shares in unlisted German public companies because they were not set up to hold foreign shares without a quoted price.

79.     Plaintiff has previously noted this potential difficulty and requested assistance from Defendant PMAG, specifically to ensure that Defendant PMAG registered the Escrow Shares in Plaintiff's name on its books and records while Plaintiff was attempting to open a suitable bank or brokerage account.  However, Defendant PMAG refused to do so.

80.     As a result, Plaintiff was forced to sell the Escrow Shares as the only solution. Plaintiff identified a buyer, Supreme, and entered into a contract whereby it would sell Supreme (which as a Swiss company that did not have an issue depositing uncertificated shares in unlisted German public companies in its bank accounts) the Escrow Shares for an aggregate amount of 6,800,000 euros (the "Escrow Share Sale Agreement").

81.     Prior to entering into the Escrow Share Sale Agreement, Plaintiff had repeated communications with Defendant PMAG, through its counsel, to ensure that (i) the form of the Escrow Share Sale Agreement was acceptable to Defendant PMAG and (ii) that Defendant PMAG would fulfill its obligations under German law and recognize the transfer of ownership from Plaintiff to Supreme and register the Escrow Shares in the Supreme's name.

82.     Defendant PMAG, through its counsel, responded several times, both telephonically and by email, that it would recognize the transfer of ownership from Plaintiff to a third-party buyer and then register the Escrow Shares in that buyer's name (as it was obligated to

do anyway under German law).  As part of this process, Defendant PMAG ultimately approved the draft Escrow Share Sale Agreement between Plaintiff and Supreme.

83.     Relying on Defendant PMAG's representations, as directed by the Management Board Defendants and the Advisory Board Defendants, Plaintiff executed the Escrow Share Sale Agreement with Supreme.

84.     On December 1, 2020, Plaintiff sent the executed Escrow Share Sale Agreement with instructions to deposit the Escrow Shares in the bank account specified by Supreme.

85.     Defendant PMAG refused to respond for several days.  On December 9, 2020, Defendant PMAG informed the Plaintiff that the Management Board Defendants and the Advisory Board Defendants were refusing to deposit the Escrow Shares in Supreme's bank account.

86.     The December 9th letter explicitly stated that the Defendants had communicated with Champlain and would continue to hold the shares in "suspense" (i.e. in the neutral bank account under Defendant PMAG's control).  Defendants would not disclose the details of their communications with Champlain, despite repeated request by Plaintiff.

87.     As a result, Plaintiff was unable to conclude the transaction set forth in the executed Escrow Share Sale Agreement, was placed in breach of that agreement and suffered damages in the amount of 4,441,750 euros, which is the difference between the sale price of 6,800,000 euros in the Escrow Share Sale Agreement and the cost of the Escrow Shares, which is the 2,358,250 euros that was not paid by Champlain.

88.     On December 18, 2020, Plaintiff informed Defendants that they were subjecting themselves to the jurisdiction of the Unites States courts by their actions and that Plaintiff would bring a claim in the United States for the above damages of 4,441,750 euros. On March 4, 2021, sent Defendants a draft complaint to show its determination to pursue its claim.

89.     As a result, beginning on March 11, 2021, Plaintiff and Defendants held two video conferences.   In those conferences, Plaintiff learned for the first time that Defendants had continuing communications with Champlain and had, without any notice whatsoever to Plaintiff, transferred control of the Escrow Shares to Champlain (specifically by transferring the unrestricted Escrow Shares from the neutral bank account under Defendant PMAG's control into Champlain's bank account), putting the Escrow Shares beyond the reach of Plaintiff.

90.     By this same action, Defendant PMAG transferred control of the original 18,866 shares of PMAG to Champlain, so that by Defendants' actions as further described below, Plaintiff now has neither:

    a.      its original 18,866 shares of PMAG;

    b.      the 2,358,250 euros it sold them to Champlain for;

    c.      the Escrow Shares that were supposed to be the security for the payment by Champlain.

91.     Despite repeated demands, Defendants continue to refuse to disclose the details of their communications with Champlain and the details of the transfer of the Escrow Shares to Champlain.  However, Defendant PMAG's transfer of control of the Escrow Shares to Champlain occurred following Plaintiff's notice to Defendant PMAG set forth in paragraph 88, above.

## COUNT I

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER
(Cause of Action against Defendant PMAG)

92.     Plaintiffs reallege and incorporate herein paragraphs 1 through 91 of this Complaint as if fully set forth herein.

93.     The acts complained of in this Complaint involved the purchase and sale of "securities," within the meaning of Section 2(1) of the Securities Act (15 U.S.C. § 77b(1)) and Section 3(a)(10) of the Exchange Act (15 U.S.C. § 78c(a)(10)), by means of written and oral communications to the United States, and by use of the means and instrumentalities of interstate commerce, including the mails and telephonic communications.

94.     The Escrow Share Sale Agreement is a domestic transaction because Plaintiff incurred irrevocable liability in the United States.  The seller, Plaintiff, incurred irrevocable liability within the United States by executing a contract (the Escrow Share Sales Agreement) in Miami Beach, Florida, to deliver a security (the Escrow Shares) to the buyer (Supreme).  Miami-Dade County, Florida was where, physically, the seller (Plaintiff) was located when it, through its sole Manager, committed itself to deliver a security (the Escrow Shares).

95.     The Escrow Share Sale Agreement is a domestic transaction because the purchaser (Supreme) was bound to pay the purchase price for the security (the Escrow Shares) in the United States (into the Florida Account).

96.     Defendant PMAG made a false statements or omissions of material fact which caused Plaintiff to enter into the Escrow Share Sales Agreement.  Specifically, Defendant PMAG:

a.     Stated to Plaintiff that Plaintiff was owner of the Escrow Shares (although, obviously, Plaintiff maintains that it was the owner of the Escrow Shares, Defendant PMAG either considers this fact to be true or false.  If false, then Defendant PMAG made a misrepresentation in the August 26th email.  If true, the Counts II through VII would apply); and/or

b.     Omitted to tell Plaintiff that providing a bank account to Computershare for deposit of the Escrow Shares was a condition of Plaintiff's ownership of the

Escrow Shares and that without the deposit, Defendant PMAG would be able to transfer the Escrow Shares to a third party without notice to Plaintiff (see parenthetical to paragraph 96(a) above); and/or

c.   Stated to Plaintiff that it would deposit the Escrow Shares in the purchaser's account if Plaintiff sold the Escrow Shares to a third party.

97.   Defendant PMAG, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails made the statements and omissions in paragraph 96, above.

98.   Defendant PMAG made the statements or omissions in paragraph 96, above, with the requisite scienter, i.e., a specific intent to deceive, manipulate and defraud Plaintiff. Specifically:

a.   Each of the Management Board Defendants and the Advisory Board Defendants, acting both individually and as a group on their respective boards, in their positions as officers and directors of Defendant PMAG, intentionally caused Defendant PMAG to make the deceptive and fraudulent statements and omissions in paragraph 96(a) and (b) in order to manipulate Plaintiff into (i) not pursuing a lawsuit against Defendant PMAG in Germany and (ii) in furtherance of a plan to keep the Escrow Shares in the name of Champlain.

b.   Each of the Management Board Defendants and the Advisory Board Defendants, acting both individually and as a group on their respective boards, in their positions as officers and directors of Defendant PMAG, knowingly and recklessly caused Defendant PMAG make the deceptive and

fraudulent statements and omissions in paragraph 89 on which Plaintiff foreseeably relied upon when executing into the Escrow Share Sale Agreement, despite the fact that they knew (or should have known) that Plaintiff would suffer damages because it would not be able to fulfil its obligations under the Escrow Share Sale Agreement and thus not receive payment for the Escrow Shares.

99.     Plaintiff justifiably relied on Defendant PMAG's deceptive and fraudulent statements and omissions in paragraph 96.   Such deceptive and fraudulent statements and omissions were made by Defendant PMAG on the direction of actions taken by the Management Board Defendants and the Advisory Board Defendants and, therefore, Plaintiff reasonably believed PMAG fully agreed that Plaintiff was the owner of the Escrow Shares and had the ability to enter into the Escrow Share Sales Agreement to sell the Escrow Shares.

100.    Plaintiff justifiably and specifically relied on Defendant PMAG's deceptive and fraudulent statements in paragraph 96(c), where Defendant PMAG had agreed that it would deposit the Escrow Shares in the purchasers account if Plaintiff sold the Escrow Shares.   Such statements were made to Plaintiff by Defendant PMAG without any qualification or condition precedent.

101.    Defendant PMAG's deceptive and fraudulent statements in paragraph 96 proximately caused Plaintiff's injuries and loss.   Specifically, Plaintiff is liable for performance of the Escrow Share Sale Agreement, which it cannot perform because Defendant PMAG will not deposit the Escrow Shares in the purchaser's (Supreme's) account.   Plaintiff's damages can be quantified as the Escrow Shares (i.e., 68,000 shares of PMAG) which would enable PMAG to perform the Escrow Share Sale Agreement, or alternatively its lost profits under the Escrow Share Sales Agreement.

102.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### TORTIOUS INTERFERENCE WITH CONTRACT RIGHTS
(Direct Cause of Action against all Defendants for Tortious Interference
in the Escrow Shares Sale Agreement)

103.     Plaintiff realleges and incorporates herein paragraphs 1 through 91 of this Complaint as if fully set forth herein.

104.     The Escrow Shares Sale Agreement was a valid and existing contract that obligated Plaintiff to sell the Escrow Shares to Supreme and obligated Supreme to pay 6,800,000 euros for them.

105.     Defendant PMAG knew of the Escrow Shares Sale Agreement (and its terms) because Plaintiff had specifically provided a copy to its attorneys and its attorney acknowledged receipt.

106.     The Management Board Defendants and the Advisory Board Defendants knew or should have known of the Escrow Shares Sale Agreement (and its terms) as officers and directors of Defendant PMAG.

107.     Defendant PMAG intentionally procured the breach of the Escrow Share Sales Agreement to prevent Plaintiff from receiving the Escrow Shares.

108.     Each of the Management Board Defendants and the Advisory Board Defendants acted individually and intentionally to cause Defendant PMAG to procure the breach of the Escrow Share Sales Agreement to prevent Plaintiff from receiving the Escrow Shares.

109.     Defendant PMAG acted without valid justification in refusing to register the Escrow Shares in the name of Supreme, and deposit the Escrow Shares in Supreme's account, as

instructed by Plaintiff, because the reason given to Plaintiff was an intentional violation of Section 67(5) of the German Stock Corporation Act.

110. Each of the Management Board Defendants and the Advisory Board Defendants acted individually and intentionally to cause Defendant PMAG to act without valid justification in refusing to register the Escrow Shares in the name of Supreme, and deposit the Escrow Shares in Supreme's account, as instructed by Plaintiff, because the reason given to Plaintiff was an intentional violation of Section 67(5) of the German Stock Corporation Act.

111. Neither Defendant PMAG nor any of the Management Board Defendants or the Advisory Board Defendants, had any beneficial or economic interest in, or control over, or potential financial interest the Escrow Share Sales Agreement.  The Escrow Share Sales Agreement did not require the approval of Defendant PMAG or any of the Management Board Defendants and the Advisory Board Defendants.  Defendant PMAG's obligation to enter Supreme in the register as the new owner of the Escrow Shares, once they were sold to Supreme by Plaintiff, was an obligation of Defendant PMAG under German law.

112. Because of Defendant PMAG's refusal (caused by the Management Board Defendants and the Advisory Board Defendants) to perform its obligation under German law and deposit the Escrow Shares in Supreme's account so that Supreme would be registered as the new owner, Defendants caused Plaintiff to be in breach of Escrow Share Sale Agreement for failing to deliver the Escrow Shares to Supreme.

113. As a result of the breach set forth in paragraph 112, above, Supreme has been released from its obligation to pay the purchase price under the Escrow Share Sales Agreement.

114. Therefore, Plaintiff has suffered damages in Florida (because the place of payment of the Escrow Share Sales Agreement was the Florida Account) in the amount of 4,441,750 euros,

which is the measure of lost profits (i.e., the difference between the sale price of 6,800,000 euros in the Escrow Share Sale Agreement and the cost of the Escrow Shares, which is the 2,358,250 euros that was not paid by Champlain).

## COUNT III

### TORTIOUS INTERFERENCE WITH CONTRACT RIGHTS
(Direct Cause of Action against all Defendants for Tortious Interference
in Plaintiff's SPA and Escrow Agreement with Champlain)

115.    Plaintiff realleges and incorporates herein paragraphs 1 through 91 of this Complaint as if fully set forth herein.

116.    The SPA and the Escrow Agreement were valid and existing contracts whereby Plaintiff agreed to sell Champlain 18,866 shares of PMAG in exchange for a payment of 2,358,250 euros and secure that payment by transferring the Escrow Shares to Plaintiff in the event of default.

117.    Defendant PMAG knew of the SPA and the Escrow Agreement (and their terms) because Plaintiff had specifically provided copies to its attorneys and its attorney acknowledged receipt.

118.    The Management Board Defendants and the Advisory Board Defendants knew or should have known of SPA and the Escrow Agreement (and their terms) as officers and directors of Defendant PMAG.

119.    All Defendants were told by Plaintiff that Champlain had never paid Plaintiff the 2,358,250 euros (nor had even offered to pay the 2,358,250 euros).

120.    Nevertheless, Defendant PMAG, (as set forth in paragraphs 89 and 90, above), transferred (and the Management Board Defendants and Advisory Board Defendants caused Defendant PMAG to transfer) all of the Escrow Shares to Champlain.

121.    Defendant PMAG's transfer of the Escrow Shares to Champlain left Plaintiff without either the 18,866 shares that it had prior to entering into the SPA and the Escrow Agreement, or the payment of 2,358,250 euros.

122.    Defendant PMAG's transfer of the Escrow Shares to Champlain, at the urging of Champlain, had the result of:

a.    relieving Champlain from its contractual obligation to pay for the 18,866 shares, i.e., to perform its obligations under the SPA, because Defendants have effectively given Champlain these shares for free.

b.    rendering the Escrow Agreement meaningless because Defendant PMAG unilaterally returned the security to Champlain.

c.    removing from Plaintiff its contractual right to receive ownership of the Escrow Shares in lieu of payment under the Escrow Agreement.

123.    Defendant PMAG's transfer of the Escrow Shares to Champlain is tortious interference in the SPA and/or the Escrow Agreement for the reasons set forth in paragraph 122, above.  This action was taken after all of the Defendants had been notified by Plaintiff that they were taking actions which would submit them to the jurisdiction of the United States courts.

124.    Neither Defendant PMAG nor any of the Management Board Defendants or the Advisory Board Defendants, had any beneficial or economic interest in, or control over, or potential financial interest the SPA and/or the Escrow Agreement.  Neither the SPA nor the Escrow Agreement required the approval of Defendant PMAG or any of the Management Board Defendants and the Advisory Board Defendants.  Defendant PMAG's obligation to enter Plaintiff in the register as the owner of the Escrow Shares, upon presentment of the documentation requested by Defendant PMAG, was an obligation of Defendant PMAG under German law.

125.     As a result of Defendants' transfer of the Escrow Shares to Champlain, Plaintiff has suffered damages in Florida (because the place of payment for the SPA was the Florida Account and the place of receipt for the Escrow Shares under the Escrow Agreement was Plaintiff's counsel's office in Florida) in the amount of 2,358,250 euros.

## COUNT IV

### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP
(Direct Cause of Action against all Defendants for Tortious Interference
in Plaintiff's SPA and Escrow Agreement with Champlain)

126.     Plaintiff realleges and incorporates herein paragraphs 1 through 91 of this Complaint as if fully set forth herein.

127.     The SPA and the Escrow Agreement were valid and existing contracts constituting an ongoing business relationship where Plaintiff agreed to sell Champlain 18,866 shares of PMAG in exchange for a payment of 2,358,250 euros and secure that payment by transferring the Escrow Shares to Plaintiff in the event of default.

128.     Defendant PMAG knew of the SPA and the Escrow Agreement (and their terms) because Plaintiff had specifically provided copies to its attorneys and its attorney acknowledged receipt.

129.     The Management Board Defendants and the Advisory Board Defendants knew or should have known of SPA and the Escrow Agreement (and their terms) as officers and directors of Defendant PMAG.

130.     At the same time, Defendants were told by Plaintiff that Champlain had never paid Plaintiff the 2,358,250 euros (nor had offered to pay the 2,358,250 euros).

131.    Defendants were also told that Plaintiff preferred to receive the payment of the 2,358,250 euros, in the Florida Account, rather than the Escrow Shares and that was the reason for the year long delay in registration.

132.    Plaintiff's attempts to collect the purchase price of 2,358,250 euros, in lieu of ownership of the Escrow Shares. constituted an ongoing business relationship regardless of Champlain's default of the SPA.

133.    Nevertheless, Defendant PMAG, (as set forth in paragraphs 89 and 90, above), transferred (and the Management Board Defendants and Advisory Board Defendants caused Defendant PMAG to transfer) all of the Escrow Shares to Champlain.

134.    Defendant PMAG's transfer of the Escrow Shares to Champlain left Plaintiff without either the 18,866 shares that it had prior to entering into the SPA and the Escrow Agreement, or the payment of 2,358,250 euros.

135.    Defendant PMAG's transfer of the Escrow Shares to Champlain, at the urging of Champlain, had the result of:

        a.    relieving Champlain from any obligation to pay for the 18,866 shares because Defendants have effectively given Champlain these shares for free.

        b.    rendering the Escrow Agreement meaningless because Defendant PMAG unilaterally returned the security to Champlain.

        c.    removing from Plaintiff its contractual right to receive ownership of the Escrow Shares in lieu of payment under the Escrow Agreement.

136.    Defendant PMAG's transfer of the Escrow Shares to Champlain is tortious interference in Plaintiff's ongoing business relationship with Champlain, set forth in paragraph 135, above. Defendants' action was taken after all of the Defendants had been notified by Plaintiff

that they were taking actions which would submit them to the jurisdiction of the United States courts.

137.    Neither Defendant PMAG nor any of the Management Board Defendants or the Advisory Board Defendants, had any beneficial or economic interest in, or control over, or potential financial interest Plaintiff's ongoing business relationship with Champlain.  Plaintiff's collection of the purchase price of 2,358,250 euros did not require the approval of Defendant PMAG or any of the Management Board Defendants and the Advisory Board Defendants. Defendant PMAG's obligation to enter Plaintiff in the register as the owner of the Escrow Shares, upon presentment of the documentation requested by Defendant PMAG, was an obligation of Defendant PMAG under German law.

138.    As a result of Defendant PMAG's transfer of the Escrow Shares to Champlain, Plaintiff has suffered damages in Florida (because the place of payment for the SPA and any collection efforts made by Plaintiff was the Florida Account) in the amount of 2,358,250 euros.

## COUNT V

## CONVERSION
(Direct Cause of Action against all Defendants)

139.    Plaintiff realleges and incorporates herein paragraphs 1 through 91 of this Complaint as if fully set forth herein.

140.    Defendant PMAG acknowledged, in the August 26th Email, that Plaintiff had title to the Escrow Shares, i.e. that the Escrow Shares were Plaintiff's property.

141.    Defendant PMAG further acknowledged, by promising to deposit the Escrow Shares in Supreme's account, pursuant to the Escrow Share Sales Agreement, that the Escrow Shares were Plaintiff's property.

142.     Plaintiff had an immediate right to possession of the Escrow Shares and this immediate right to possession was acknowledged by Defendant PMAG in the August 26th Email.

143.     Alternatively to paragraphs 140 through 142, Plaintiff had an immediate right to possession of the original 18,866 shares of PMAG that were effectively contained within the Escrow Shares and transferred to Champlain, because the sole possible rationale Defendant PMAG has given for the transfer of the Escrow Shares to Champlain is that the SPA was null and void.

144.     The registration of Plaintiff in the Defendant PMAG's share register was wholly within the control of Defendant PMAG and therefore Plaintiff's inability to register the Escrow Shares was the result of Defendant PMAG's failure to perform its obligations to Plaintiff under German law.  Therefore, Defendant PMAG was solely responsible for Plaintiff not being able to exercise its immediate right of possession.

145.     Defendant PMAG transferred Plaintiff's property, i.e., the Escrow Shares (or alternatively the 18,866 shares of PMAG), to Champlain, thus wrongfully denying Plaintiff of its property.

146.     Plaintiff has made demand for the Escrow Shares (and alternatively the 18,866 shares of PMAG) and Defendants have refused to return them.

147.     Plaintiff has suffered economic loss as a result of:

   a.     Defendant PMAG transferring Plaintiff's property, i.e., the Escrow Shares (or alternatively the 18,866 shares of PMAG), to Champlain; and/or

   b.     Defendant PMAG's refusal to enter Plaintiff as the shareholder of the Escrow Shares on its share register, regardless of Plaintiff's inability to open a suitable bank account, as it was required to do under German law, as a

result of its acknowledgement of Plaintiff's ownership of the Escrow Shares.

148.    Each of the Management Board Defendants and the Advisory Board Defendants individually knew that Plaintiff had an immediate right to possession of the Escrow Shares and, nevertheless caused Defendant PMAG to:

    a.    transfer Plaintiff's property, i.e., the Escrow Shares (or alternatively the original 18,866 shares of PMAG), to Champlain; and/or

    b.    refuse to enter Plaintiff as the shareholder of the Escrow Shares on its share register, regardless of Plaintiff's inability to open a suitable bank account, as it was required to do under German law, as a result of its acknowledgement of Plaintiff's ownership of the Escrow Shares.

149.    Defendant PMAG's transfer of the Escrow Shares to Champlain was taken after all of the Defendants had been notified by Plaintiff that they were taking actions which would submit them to the jurisdiction of the United States courts.

150.    The tort of conversion set forth in this Count V occurred in Florida because, as a direct and proximate result of Defendant PMAG's conversion of the Escrow Shares, Plaintiff could not perform the Escrow Share Sales Agreement and therefore, did not receive payment for the sale of the Escrow Shares in the Florida Account.

151.    As a result of Defendant PMAG's conversion of the Escrow Shares Plaintiff was damaged in Florida in the amount of 4,441,750 euros, which is the measure of lost profits (i.e. the difference between the sale price of 6,800,000 euros in the Escrow Share Sale Agreement and the cost of the Escrow Shares, which is the 2,358,250 euros that was not paid by Champlain)).

152.    Alternatively to paragraph 150, the tort of conversion set forth in this Count V occurred in Florida because, as a direct and proximate result of Defendant PMAG's conversion of the original 18,866 shares of PMAG, Defendant knew that Champlain would not have to pay the purchase price under the SPA and Plaintiff, therefore, would not receive payment for the sale of the original 18,866 shares of PMAG in the Florida Account.

153.    Alternatively to paragraph 151, as a result of Defendant PMAG's conversion of the original 18,866 shares of PMAG, Plaintiff was damaged in Florida in the amount of 2,358,250 euros, which was the purchase price under the SPA.

## COUNT VI

### CIVIL CONSPIRACY
(Direct Cause of Action against all Defendants)

154.    Plaintiff realleges and incorporates herein paragraphs 1 through 90 and 140 through 153 of this Complaint as if fully set forth herein.

155.    Each of Defendant PMAG, the Management Board Defendants and the Advisory Board Defendants individually conspired with Champlain by means of written and telephonic communication to wrongly transfer control (or procure that Defendant PMAG wrongly transfer control) of the Escrow Shares owned by Plaintiff to Champlain as more fully set forth in Count III (Tortious Interference with the SPA and Escrow Agreement), Count IV (Tortious Interference with Plaintiff's Business Relations with Champlain), and Count V (Conversion).

156.    Defendant PMAG overtly acted in pursuance of the conspiracy by wrongly transferring control of the Escrow Shares (or alternatively the 18,866 shares of PMAG) owned by Plaintiff to Champlain as more fully set forth in Count III (Tortious Interference with the SPA and

Escrow Agreement), Count IV (Tortious Interference with Plaintiff's Business Relations with Champlain), and Count V (Conversion).

157.    The Management Board Defendants and the Advisory Board Defendants individually either overtly acted in pursuance of the conspiracy by wrongly procuring that Defendant PMAG transfer control of the Escrow Shares (or alternatively the 18,866 shares of PMAG) owned by Plaintiff to Champlain as more fully set forth in Count III (Tortious Interference with the SPA and Escrow Agreement), Count IV (Tortious Interference with Plaintiff's Business Relations with Champlain), and Count V (Conversion), or knew of the conspiracy and assisted by agreeing to the conspiracy with Champlain as officers and directors of Defendant PMAG.

158.    As a result of the acts performed pursuant to the conspiracy, Plaintiff suffered damages in Florida as follows:

    a.    As a result of the conspiracy, Plaintiff did not receive in the Florida Account the amount of 4,441,750 euros, which is the measure of lost profits (i.e. the difference between the sale price of 6,800,000 euros in the Escrow Share Sale Agreement and the cost of the Escrow Shares, which is the 2,358,250 euros that was not paid by Champlain (as set forth in Count V (Conversion)); or, alternatively,

    b.    As a result of the conspiracy, Plaintiff did not receive in the Florida Account the amount of 2,358,250 euros that Champlain was able to evade paying as set forth in Count III (Tortious Interference with the SPA and Escrow Agreement) and Count IV (Tortious Interference with Plaintiff's Business Relations with Champlain) (and as set forth as alternative damages in Count V (Conversion))

34

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A.       Demand judgment under:

    i.        Count I (Violation of Rule 10b-5) for money damages in excess of $75,000, exclusive of interest and costs from Defendant PMAG, or alternatively,

    ii.      Under Count II (Tortious Interference with the Escrow Share Sales Agreement) for money damages in in the amount of 4,441,750 euros, exclusive of interest and costs from all Defendants jointly and severally, or alternatively,

    iii.    Under Count III (Tortious Interference with the SPA and the Escrow Agreement) for money damages in in the amount of 2,358,250 euros, exclusive of interest and costs from all Defendants jointly and severally, or alternatively,

    iv.    Under Count VI (Tortious Interference with the Plaintiff's Business Relationship with Champlain) for money damages in in the amount of 2,358,250 euros, exclusive of interest and costs from all Defendants jointly and severally, or alternatively,

    v.      Under Count V (Conversion):

        a.      for money damages in in the amount of 4,441,750 euros, exclusive of interest and costs from all Defendants jointly and severally, or alternatively,

b.      for money damages in in the amount of 2,358,250 euros, exclusive of interest and costs from all Defendants jointly and severally, or alternatively,

vi.      Under Count VI (Civil Conspiracy):

a.      for money damages in in the amount of 4,441,750 euros, exclusive of interest and costs from all Defendants jointly and severally, or alternatively,

b.      for money damages in in the amount of 2,358,250 euros, exclusive of interest and costs from all Defendants jointly and severally, or alternatively,

B.      Demand judgment for punitive damages, reasonable attorneys' fees, costs and disbursements of this action, and prejudgment interest.

C.      Request such other and further relief as this Court deems equitable and just.

Respectfully submitted.

Dated: September 7, 2021

**/s/Adam Kravitz**
Adam Kravitz (Florida Bar No. 987425)
Attorney E-mail: adam@kravitzco.com
KRAVITZ & CO., P.A.
121 Alhambra Plaza, 10th Floor
Coral Gables, FL 33134
Telephone: (305) 335-0330
Facsimile:  (305) 716-9174
*Attorneys for Plaintiff Sturmanskie LLC*

## **<u>VERIFICATION</u>**

The undersigned declares that he has read the foregoing Complaint and verifies that the

factual allegations contained therein are true, correct, and accurate to the best of my knowledge.

Sturmanskie LLC

By:_____
Adam Kravitz, Manager