UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:21-cv-21091-JEM/Becerra

STURMANSKIE LLC,

      Plaintiff,

v.

PICTUREMAXX AG, GERHARD FEIGL,
MARCIN CZYZEWSKI, MATTHIAS
DITTLER, THOMAS KIESSL, and
ALEXANDER RÜEGG,

      Defendants.

_____/

## REPORT AND RECOMMENDATION ON DEFENDANTS'
## MOTION TO DISMISS AMENDED COMPLAINT

**THIS MATTER** is before the Court on Defendants' picturemaxx Ag ("Picturemaxx"), Gerhard Feigl, Marcin Czyzewski, Matthias Dittler, Thomas Kiessl, and Alexander Rüegg ("Defendants") Motion to Dismiss Amended Complaint ("Motion to Dismiss"). ECF No. [30]. Plaintiff Sturmanskie LLC ("Plaintiff" or "Sturmanskie") filed its Response to Defendants' Motion to Dismiss, ECF No. [32], and Defendants filed their Reply, ECF No. [38]. The undersigned heard oral argument on the matter. ECF No. [49]. Pursuant to 28 U.S.C. § 636, the Honorable Jose E. Martinez, United States District Judge, referred this Motion to Dismiss to the undersigned. ECF No. [39]. For the reasons stated below, the undersigned respectfully **RECOMMENDS** that Defendants' Motion to Dismiss be **GRANTED** on the basis that this Court lacks personal jurisdiction over Defendants.

I.       BACKGROUND

A.  The Parties

Sturmanskie is a Delaware-registered limited liability company.  ECF No. [21] ¶¶ 2, 38. Sturmanskie's sole manager, attorney Adam Kravitz of the law firm of Kravitz & Co. PA ("K&Co"), and its counsel, K&Co, are located in Miami-Dade County, Florida.  *Id.* ¶ 38. According to Plaintiff, its "sole operation as a business" was through its sole manager, and therefore, was within the State of Florida. *Id.* ¶ 53.

Picturemaxx is a joint stock company registered in Germany.  *Id.* ¶ 39.  Picturemaxx has a Supervisory Board elected by shareholders, tasked with "approv[ing] major corporate decisions," and a Management Board appointed by the Supervisory Board.  *Id.* ¶ 40.   Members of the Management Board named as Defendants are Gerhard Fiegl, the CEO, and Marcin Czyzewski, the CTO, and members of the Advisory/Supervisory Board that are named as Defendants are Matthias Dittler, Thomas Kiessl, and Alexander Rüegg (collectively, the "Individual Defendants.").  *See id.* ¶¶ 20, 25.   The Individual Defendants have residency or citizenship in Germany and/or Switzerland.  *Id.* ¶¶ 39–45.  Plaintiff alleges that "all decisions regarding the registration of the [shares at issue] were made by both the Supervisory and the Management Board." *Id.*

B.  The Champlain Agreements

In April 2018, Sturmanskie owned 18,866 shares of Defendant Picturemaxx's common stock in the form of uncertificated bearer shares (the "Original Shares").  *Id.* ¶ 3.  On April 24, 2018, Plaintiff entered into a purchase agreement (the "Champlain SPA") with a third-party Panamanian company, Champlain Holding S.A. ("Champlain"), to sell its Original Shares for €125.00 per share, totaling €2,358,250.00.  *Id.* ¶ 4.  The negotiations between Sturmanskie and Champlain took place primarily through e-mail with Plaintiff's manager, Mr. Kravtiz, who was

located in Florida.  *Id.* ¶ 56.  Payment under the Champlain SPA was to be made to "Plaintiff's counsel's Florida IOTA account located in Miami-Dade County, Florida" (the "Florida Account").  *Id.* ¶ 5.  The Champlain SPA provided that Champlain would make the full payment of €2,358,250.00 by September 30, 2018.  *Id.* ¶ 6.

Because Champlain was unable to procure the funds to complete the transaction, the parties entered into another agreement (the "Champlain Escrow Agreement"), wherein Champlain executed a notarized acknowledgment of transfer for 68,000 shares to Sturmanskie (the "Escrow Shares") as security for performance of the transaction.  *Id.* ¶¶ 7–9, 11.  As to the Champlain Escrow Agreement, the parties agreed to exclusive jurisdiction in Miami-Dade County, Florida.  *Id.* ¶ 10.  Sturmanskie "delivered the original acknowledgement of transfer, legalized at the German consulate in Miami," in order to transfer the Original Shares to Champlain, and Champlain's counsel "delivered to K&Co in Florida, for holding in escrow, an original acknowledgement of transfer for the Escrow Shares."  *Id.*  ¶¶ 59–60.  On September 30, 2018, Champlain failed to make payment, and Sturmanskie sought to recover the Escrow Shares from K&Co.  *See id.* ¶ 13.  According to Sturmanskie, K&Co transferred ownership of the Escrow Shares to Sturmanskie through delivery of the notarized acknowledgment of transfer in Florida.  *Id.* ¶¶ 14, 62.

### C.  Sturmanskie's Attempt to Register Shares

After a year-long attempt to obtain performance from Champlain under the Champlain SPA, Sturmanskie contacted Picturemaxx seeking to register the Escrow Shares.  *Id.* ¶ 16.  Plaintiff's counsel and manager in Florida communicated with Picturemaxx from a Florida e-mail, through five email exchanges, as well as through one phone call.  *Id.* ¶¶ 16–17.  Picturemaxx initially refused to register the Escrow Shares, and its Management Board and Advisory Board

requested that Sturmanskie provide documentary proof of ownership.  *Id.* ¶¶ 18–20, 66.  According to Plaintiff, the request was meant to "create[] difficulty [for Plaintiff] because Defendants preferred that Champlain" own the Escrow Shares.  *Id.* ¶ 67.  In addition, Picturemaxx contacted Champlain, which denied the transfer of ownership of the Escrow Shares to Sturmanskie, claiming that the Champlain SPA was "null and void because the Escrow Shares were 'over-securitization' under Swiss law."  *Id.* ¶¶ 21, 23.  Although Mr. Kravitz provided proof of ownership on behalf of Sturmanskie, including the notarized acknowledgment of transfer, Picturemaxx did not acknowledge ownership of the Escrow Shares at issue.  *See id.* ¶ 22.

In August 2020, Sturmanskie provided Picturemaxx with a draft complaint that had been drafted by German counsel retained by Sturmanskie, to be filed in Munich, Germany.  *Id.* ¶ 24. On August 26, 2020, Picturemaxx's German counsel communicated to Sturmanskie's German counsel by e-mail and telephone that it's Management Board and Supervisory Board members had determined that Sturmanskie was the rightful owner of the Escrow Shares, and informed Sturmanskie that it would register the Escrow Shares in Sturmanskie's name (the "August 26th E-mail").  *See id.* ¶ 25.  On the phone call, Picturemaxx informed Sturmanskie's German counsel that the decision to recognize Sturmanskie as the owner of the shares "was decided by the Management Board Defendants and the Advisory Board Defendants as a corporate action."  *Id.* ¶ 72.  Along with those communications, Picturemaxx requested that Plaintiff open a bank account so that Picturemaxx's transfer agent, Computershare, could deposit the uncertificated Escrow Shares, as part of the process to register the shares.  *Id.* ¶ 26.

Plaintiff alleges it was unable to open a bank account which could hold the Escrow Shares because European banks would not open a bank account for a U.S. company due to various U.S. securities and banking laws.  *Id.* ¶ 27.  Although Sturmanskie requested Picturemaxx's assistance,

Picturemaxx did not provide any.  *Id.* ¶ 29.  Plaintiff alleges that it "was not given a time limit to register the Escrow Shares, nor was Plaintiff informed that if it did not register the Escrow Shares [] it would risk losing ownership of them to any other party."  *Id.* ¶ 76.

### D.  The Supreme Escrow Share Sale Agreement

Unable to open a bank account to hold the Escrow Shares, Sturmanskie sought to sell the uncertificated Escrow Shares to Supreme AG ("Supreme"), a Swiss company.  *Id.* ¶ 30–31. Because Supreme was not a U.S. company, it would not have the same issue as Sturmanskie in depositing the uncertificated shares.  *Id.*  Prior to any agreement with Supreme, Sturmanskie's German counsel contacted Picturemaxx to confirm that the sale to Supreme would be acceptable to Picturemaxx and that it would register the Escrow Shares in Supreme's name.  *Id.* ¶ 33. According to Sturmanskie, upon Picturemaxx's confirmation, Sturmanskie and Supreme entered into an agreement (the "Supreme Escrow Share Sale Agreement") whereby Sturmanskie would sell Supreme the Escrow Shares for €6,800,000.  *Id.* ¶¶ 31, 34.

On December 1, 2020, Sturmanskie's counsel sent to Picturemaxx's counsel an executed version of the Supreme Escrow Share Sale Agreement and requested that the Escrow Shares be transferred to Supreme.  *Id.* ¶ 35.  On December 9, 2020, Picturemaxx informed Sturmanskie by letter that, at the direction of its Management Board and Supervisory Boards, it would not transfer the Escrow Shares to Supreme.  *Id.* ¶¶ 35, 85–86.  As a result, Sturmanskie breached the Supreme Escrow Share Sale Agreement and did not receive payment from Supreme.  *Id.* ¶ 36.  In March 2021, Sturmanskie learned, via videoconference, that Picturemaxx transferred the Escrow Shares to Champlain.  *Id.* ¶¶ 37, 89.  Accordingly, Sturmanskie was left without its Original Shares, the Escrow Shares, or the payment from Champlain as agreed to in the Champlain SPA.  *Id.*

Plaintiff now alleges it has suffered damages in the amount of €4,441,750 in lost profits. *Id.* ¶ 114.  Specifically, Plaintiff alleges that had Defendants' actions not caused it to breach the Supreme Escrow Share Sale Agreement, Plaintiff stood to receive payment of €6,800,000.  *Id.* Under the Champlain SPA, Plaintiff was to receive €2,358,250.  Thus, Plaintiff alleges that it is entitled to the difference between what it would have received from the Supreme Escrow Share Sale Agreement and the Champlain SPA.  *Id.*

## II.    THE INSTANT MOTION

In the First Amended Complaint (the "Amended Complaint"), Sturmanskie alleges securities fraud under Section 10(b) and Rule 10b-5 (Count I), tortious interference (Counts II–IV), conversion (Count V), and civil conspiracy (Count VI).  *See generally* ECF No. [21]. Specifically, the Amended Complaint alleges that Picturemaxx violated Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (the "Exchange Act") by making false statements or omissions in connection with Sturmanskie's sale of securities to Supreme, causing Sturmanskie to enter into the Supreme Escrow Share Sale Agreement.  *Id.* ¶¶ 92–102.  Sturmanskie also alleges that Defendants committed tortious interference as to Sturmanskie's contract rights with both Supreme and Champlain, as well as with its business relationship with Champlain.  *Id.* ¶¶ 103–38. Additionally, in its conversion claim, Sturmanskie alleges that Picturemaxx wrongfully transferred the Escrow Shares, or in the alternative, the Original Shares, to Champlain, constituting a loss of Sturmanskie's property.  *Id.* ¶¶ 139–53.  Finally, Sturmanskie alleges that the wrongful transfer of its shares resulted from a civil conspiracy between Defendants and Champlain.  *Id.* at 154–58.

Defendants' Motion to Dismiss sets forth various grounds for dismissal of Sturmanskie's Amended Complaint.  *See generally* ECF No. [30].  As an initial matter, Defendants contend that this Court lacks personal jurisdiction over Defendants.  *Id.* at 10–12.  Defendants argue that

exercising personal jurisdiction would violate the Florida long-arm statute and due process because Defendants lack minimum contacts with Florida. *See id.* at 12–14. Defendants also move to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). First, Picturemaxx alleges that Count I fails to state a viable claim under the Exchange Act. *Id.* at 15–26. Second, Defendants contend that Sturmanskie fails to adequately plead the elements required to maintain claims for tortious interference as to Counts II, III, and IV. *Id.* at 26–31. Third, Defendants argue that Sturmanskie's Count V conversion claims fails because Sturmanskie did not own the Escrow Shares and could not simultaneously own the Original Shares and have sold the Original Shares to Champlain. *Id.* at 31–32. Finally, Defendants argue that the Count VI conspiracy claim fails due to failure to establish an actionable underlying tort or that the Individual Defendants had a personal stake in any alleged conspiracy. *Id.* at 32–34.

Sturmanskie counters that this Court has personal jurisdiction over Defendants under the Florida long-arm statute, which comports with due process, because its manager and operations were located in Florida, and it suffered harm in Florida when it did not receive payment in the Florida Account. ECF No. [32] at 22–29. Sturmanskie also contends that personal jurisdiction is established under Federal Rule of Civil Procedure 4(k)(2), known as the "federal long-arm statute," which permits jurisdiction over a foreign defendant that has sufficient contacts with the United States as a whole, rather than a particular state. *See id.* at 20–22. As to Defendants' arguments for dismissal under Rule 12(b)(6), Plaintiff argues that it has met the heightened pleading standards to allege a domestic transaction and that Defendants knowingly made fraudulent misrepresentations or omissions in its Exchange Act claim in Count I. *Id.* at 11–20. Plaintiff also argues that it has sufficiently pled Counts II, III, and IV for tortious interference. *Id.* at 21–26. Plaintiff contends it alleges conversion in Count V because Plaintiff owned the Escrow Shares and

"as the owner it has an immediate right to possession over the Escrow Shares." *Id.* at 26.  Finally, Sturmanskie argues that it has pled in Count VI, evidenced by communications, that Picturemaxx, the Individual Defendants, and Champlain conspired to defraud Plaintiff of the Escrow Shares and instead transferred the shares to Champlain. *Id.* at 28–30.

In the Reply, Defendants argue that applying specific personal jurisdiction would violate due process because the only connection to the forum is the location of Sturmanskie's manager and counsel, which is not sufficient to establish jurisdiction. *See* ECF No. [38] at 1–3.  Defendants also contend that this is not the type of case with such extensive contacts with the nation as a whole to satisfy jurisdiction under Rule 4(k)(2). *Id.* at 4–6.  Finally, Defendants reiterate that Sturmanskie fails to state claims for relief on all of the alleged counts. *Id.* at 5–15.

### III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a claim for failure to state a claim upon which relief can be granted.  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true. *See Brooks v. Blue Cross & Blue Shield of Fla. Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).  A pleading is facially plausible when the plaintiff states enough facts for the court to draw a "reasonable inference" that the defendant is liable for the alleged conduct. *Iqbal*, 556 U.S. at 678.  Additionally, courts typically "may not consider materials outside 'the four corners of the complaint' when ruling on a motion to dismiss for failure to state a claim under [Rule] 12(b)(6)" unless the extrinsic document is: "(1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *Douzable v. NewRez, LLC*, No.

19-61203-CIV, 2019 WL 8888210, at *1 (S.D. Fla. Oct. 10, 2019) (quoting *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1337 (11th Cir. 2010)).

Pursuant to Federal Rule of Civil Procedure 12(b)(2), a party may move for dismissal for lack of personal jurisdiction.  Fed. R. Civ. P. 12(b)(2).  "A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging . . . sufficient facts to make out a prima facie case of jurisdiction."  *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009).  If a plaintiff meets its initial burden to establish a prima facie case in support of personal jurisdiction, "courts may then consider affidavits, documents, or other testimony provided by the defendant challenging the allegations supporting personal jurisdiction."  *Lopatine v. Finlink, Inc.*, No. 21-20987-CIV, 2021 WL 3129933, at *1 (S.D. Fla. July 23, 2021) (citing *Stubbs v. Wyndham Nassau Resort and Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006)).  If a defendant provides such material, the burden shifts back to the plaintiff.  *Id.*

In order to exercise personal jurisdiction over a nonresident defendant, the Florida long-arm statute must be satisfied and the exercise of jurisdiction must not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  *Posner, et. al. v. Essex Ins. Co.*, 178 F.3d 1209, 1214 (11th Cir. 1999).  As to the first prong, the long-arm statute applies "to those who '[c]ommit[ ] a tortious act within th[e] state.'"  *Id.* at 1216 (quoting Fla. Stat. § 48.193(1)(b)).  "[U]nder Florida law, a nonresident defendant commits 'a tortious act within [Florida]' when he commits an act outside the state that causes injury within Florida."  *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1353 (11th Cir. 2013) (citing *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008)); *see also Posner*, 178 F.3d at 1216.

In determining whether the exercise of personal jurisdiction comports with due process, a court must determine whether a defendant had minimum contacts within the forum state such that

the exercise of jurisdiction does not offend "traditional notions of fair play." *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626 (11th Cir. 1996).  The Eleventh Circuit has set forth a three-part due process test, which analyzes:

> (1) whether the plaintiff's claims "arise out of or relate to" at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant "purposefully availed" himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice."

*Mosseri*, 736 F.3d at 1355 (citations omitted).  Moreover, the location of the plaintiff cannot be the only link between the defendant and the forum, as it is a defendant's conduct that must form the necessary connection with the forum state.  *See Walden v. Fiore*, 571 U.S. 277, 285–86 (2014).

Federal Rule of Civil Procedure 4(k)(2)—known as the "federal long-arm statute"—provides another, though limited, ground to exercise personal jurisdiction.  *Herederos de Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 535 F. Supp. 3d 1299, 1306 (S.D. Fla. 2021), *reconsideration denied*, No. 20-21630-CIV, 2021 WL 3054908 (S.D. Fla. July 20, 2021).  Under Rule 4(k)(2), a district court may exercise personal jurisdiction where the claim at issue "arise[s] under federal law," and exercising jurisdiction is "consistent with the Constitution and laws of the United States."  *Fraser v. Smith*, 594 F.3d 842, 849 (11th Cir. 2010).  Under Rule 4(k)(2), "the applicable forum for the minimum contacts analysis is the United States."  *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1220 (11th Cir. 2009) (citation and quotations omitted).

## IV.    ANALYSIS

As described above, there are two sets of transactions that form the basis of the suit.  The first concerns the Champlain SPA and Champlain Escrow Agreement.  Under those agreements, Champlain was to provide Sturmanskie with a notarized acknowledgment of transfer of 68,000 Escrow Shares, as security for Champlain's payment.  Plaintiff alleges that Champlain failed to

make payment and so Plaintiff transferred ownership of the Escrow Shares to itself, via the notarized acknowledgement of transfer. Plaintiff alleges that Defendants subsequently transferred ownership of those shares to Champlain, even though Plaintiff was the rightful owner by virtue of delivery of the notarized acknowledgment of transfer. There is no dispute that Defendants and Champlain are non-residents, and there is no dispute that the transactions took place outside of Florida. Instead, Plaintiff alleges that the Court has personal jurisdiction over Defendants because Defendants' transfer of the shares to Champlain caused Plaintiff harm in Florida, given that Plaintiff's manager is located in Florida and Plaintiff maintains operations in Florida.

The second transaction concerns the Supreme Escrow Share Sale Agreement, whereby Plaintiff agreed to sell the Escrow Shares to a Swiss company, Supreme. Plaintiff alleges that it was induced into entering into the Supreme Escrow Share Sale Agreement because Defendants made certain misrepresentations to Plaintiff, intending to reach into Florida. Specifically, Picturemaxx informed Sturmanskie that it, by decision of the Management and Advisory Boards, recognized Sturmanskie (and not Champlain) as the owner of the Escrow Shares, and that Picturemaxx would register the Escrow Shares in the name of a third-party buyer should Plaintiff sell the Escrow Shares. As a result of those communications, Plaintiff entered into the Supreme Escrow Share Sale Agreement. When Picturemaxx subsequently refused to recognize Plaintiff as the owner of the Escrow Shares or deposit the Escrow Shares into Supreme's account, Plaintiff was forced to breach the Supreme Escrow Share Sale Agreement, and thus, did not receive payment from Supreme in their Florida Account.[1] Plaintiff alleges that these communications are

---

[1] As to the argument concerning the place of payment for the Escrow Share Sale Agreement, Defendants noted at the hearing that the "Florida Account" actually has wiring instructions to a North Carolina account, such that under Plaintiff's theory, any harm would have occurred in North Carolina. Plaintiff responded that the Amended Complaint already notes that "[t]he Florida Account is located at a Miami-Dade County branch of BB&T [now Truist] and is governed by the

sufficient to confer personal jurisdiction over Defendants.  Specifically, Plaintiff argues that the e-mails and a phone call were directed at Plaintiff's manager, who was located in Florida.  Plaintiff also alleges that it suffered harm in Florida, because it stood to receive payment from Supreme in Florida, and the harm occurred in Florida because that is where Plaintiff operates.

### A.  Personal Jurisdiction

In order to determine whether the Court has personal jurisdiction over Defendants, the undersigned first turns to Florida's long-arm statute.  Under the statute, "'[a] person, whether or not a citizen or resident of this state' who commits 'a tortious act within this state' effectively 'submits himself or herself . . . to the jurisdiction of the courts of this state.'"  *Hyundai Motor Am. Corp. v. EFN W. Palm Motor Sales, LLC*, No. CV 20-82102, 2022 WL 604071, at *4 (S.D. Fla. Mar. 1, 2022) (quoting Fla. Stat. § 48.193(2)).[2]  Accordingly, "a nonresident defendant commits 'a tortious act within [Florida]' when he commits an act outside the state that causes injury within Florida."  *Mosseri*, 736 F.3d at 1353 (citing *Licciardello*, 544 F.3d at 1283); *see also Posner*, 178 F.3d at 1216.  Thus, a defendant need not be physically present in Florida, but rather jurisdiction can be established by way of "'telephonic, electronic, or written communication into Florida' so long as the tort alleged arises from such communications."  *Internet Sols. Corp. v. Marshall*, 557 F.3d 1293, 1297 (11th Cir. 2009) (quoting *Wendt v. Horowitz*, 822 So. 2d 1252,1260 (Fla. 2002)), *certified question answered*, 39 So. 3d 1201 (Fla. 2010).

---

IOTA rules of the Florida Bar, although BB&T's head office is in North Carolina."  ECF No. [21] ¶ 5.  Because the Court must accept Plaintiff's factual allegations as true and is limited to the allegations in the Amended Complaint, the Court considers that Plaintiff stood to receive payment to an account in Florida.  *See Brooks*, 116 F.3d at 1369; *Douzable*, 2019 WL 8888210, at *1.

[2] Because whether a defendant's conduct falls under the statute "is a question of Florida law," federal courts must "apply the statute as would the Florida Supreme Court" and "Florida's District Courts of Appeal absent some indication that the Florida Supreme Court would hold otherwise."  *Mosseri*, 736 F.3d at 1352 (citation and quotations omitted).

Plaintiff claims that it was injured in Florida because it did not receive payment for the Escrow Shares into its Florida bank account, and that the harm from both sets of failed transactions was felt in Florida because its manager and operations are located in Florida. Assuming that the injury was even in Florida, as opposed to Delaware, these injuries were not caused by the acts of Defendants. Indeed, Supreme and Champlain, rather than Defendants, were the entities that failed to pay Plaintiff. As to the Champlain SPA and Champlain Escrow Agreement, Defendants' only act was the transfer of the Escrow Shares to Champlain, a transfer which did not occur in Florida. Instead, Plaintiff argues that that action caused harm in Florida because Plaintiff has its sole manager in Florida. As to the Supreme Escrow Share Sale Agreement, Defendants' only conduct was communications with Plaintiff's manager who happened to live in Florida. This is not sufficient. Under Florida law, the defendant must directly cause the alleged harm in order to confer personal jurisdiction. *See Custom Fab, Inc. v. Kirkland*, No. 6:13-CV-1511-ORL-31, 2014 WL 260090, at *5 (M.D. Fla. Jan. 23, 2014) (finding "no specific jurisdiction over the Defendant under Florida Statutes § 48.493(1)(a)(2)" because "the impact [of the alleged harm] here is indirect"); *Blumberg v. Steve Weiss & Co., Inc.*, 922 So. 2d 361, 364 (Fla. 3d DCA 2006) ("While a defendant's physical presence in the state is not required, it is not, however, enough that the actions of a defendant committed outside of Florida ultimately have consequences in Florida. Instead, his actions must directly cause injury or damage within the state.") (citing *Korman v. Kent,* 821 So. 2d 408, 410–11 (Fla. 4th DCA 2002)). Because Plaintiff only alleges indirect harm, in the form of third parties' failure to pay Plaintiff because of Defendants' communications and transfer of the Escrow Shares, Plaintiff has failed to plead an injury sufficient to confer personal jurisdiction under the Florida long-arm statute.

However, even if Florida's long-arm statute applied, the Court finds that exercising jurisdiction over Defendants would not comport with due process.  In determining whether the exercise of jurisdiction comports with due process, the Eleventh Circuit considers whether: (1) the plaintiff's claims relate to the defendant's forum contacts; (2) the defendant "purposefully availed" himself of the benefits of the forum; and (3) the exercise of jurisdiction would be fair and just. *Mosseri*, 736 F.3d at 1355 (citations omitted).  Additionally, "it is the defendant, not the plaintiff or third parties, who create contacts with the forum State" and the place of "injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State." *Walden*, 571 U.S. at 290–91.

The Supreme Court clarified the due process requirement for personal jurisdiction in *Walden v. Fiore*.  571 U.S. 277 (2014).  In *Walden*, the Supreme Court considered whether a state could exercise personal jurisdiction over a defendant where the defendant had no contacts with the forum other than knowing that his allegedly tortious conduct outside of the forum would cause harm to a plaintiff in the forum state.  *Id.* at 279.  The plaintiffs were traveling from Puerto Rico to Nevada, with a connecting flight in Georgia.  *Id.* at 280.  While in Georgia, defendant, a deputized agent of the Drug Enforcement Administration (DEA), searched and seized cash from plaintiffs, who claimed they were professional gamblers, before they boarded their plane to Nevada.  *Id.*  The defendant later drafted an affidavit to show probable cause for forfeiture of the funds. *Id.*  Although the money was eventually returned to plaintiffs, they brought a Bivens action against defendant, contending that the affidavit was false and misleading.  *Id.* at 281.

The Supreme Court held that the defendant lacked minimum contacts with Nevada to confer jurisdiction.  *Id.* at 288.  Specifically, the defendant took no action in Nevada, but rather searched and seized the money from plaintiffs and drafted the affidavit in Georgia.  *Id.*  The fact

14

that the defendant knew his conduct would cause harm to plaintiffs in Nevada, by acting in Georgia, was insufficient to confer jurisdiction in Nevada. *Id.* at 289. The Court reasoned that "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* at 290. Indeed, the harm occurred "in Nevada not because anything independently occurred there, but because Nevada is where [plaintiffs] chose to be . . . . at a time when they desired to use the funds seized by [defendant]. [Plaintiffs] would have experienced this same [harm] in California, Mississippi, or wherever else they might have traveled . . . ." *Id.* Accordingly, *Walden* makes clear that it is the defendant's conduct that must form the necessary connection with the forum state, as opposed to a link solely with the plaintiff. *See id.* at 285–86.

Plaintiff argues that even a single act of an intentional tort can be enough to confer jurisdiction. ECF No. [32] at 25–26. Specifically, Plaintiff argues that because the intentional torts were "aimed at the forum state" and "caused harm that the defendant should have anticipated would be suffered in the forum state," this Court should exercise jurisdiction over Defendants. *Id.* In support of its position, however, Plaintiff cites to pre-*Walden* cases to argue that Plaintiff sufficiently alleges that Defendants intentionally sent communications into Florida, knowing that Plaintiff would suffer harm in Florida. *See id.* at 26–27. Indeed, Plaintiff's reliance on the *Calder* "effects test" pre-dates *Walden's* clarification that the plaintiff cannot be the only link to the forum state. *See Textile USA, Inc. v. Diageo N. Am., Inc.*, No. 15-24309-CIV, 2017 WL 10187642, at *7 (S.D. Fla. July 31, 2017) (noting that plaintiff "cites to various Eleventh Circuit decisions holding that a defendant's tortious activity against a Florida resident creates sufficient connection with the state to support the exercise of personal jurisdiction . . . . Since these cases were issued, however,

15

the Supreme Court has clarified that the 'plaintiff cannot be the only link between the defendant and the forum'") (quoting *Walden*, 571 U.S. at 285).

The case at hand is similar to the facts in *Lopatine*. 2021 WL 3129933, at *1. There, the plaintiffs alleged that the defendant breached the parties' agreements concerning defendant's purchase of a company from plaintiffs by defaulting after the plaintiffs sold and transferred their interest in the company. *Id.* This Court considered that "the Defendant is neither headquartered in Florida nor is its principal place of business here," that defendant did not have employees in Florida, and that defendant did not sell products in Florida. *Id.* at *4. Rather, the Court considered that "[i]t appear[ed] that the heart of the Defendant's connections with the state are through Mr. Lopatine and the other Plaintiffs" and "exercising jurisdiction over the Defendant on this basis would violate the Due Process Clause of the United States Constitution." *Id.* The Court found that while the Defendant had engaged with the plaintiffs, who lived or had their principal place of business in the state, "those connections are with the Plaintiffs and not with the state of Florida itself. Indeed, if . . . Plaintiffs were to move tomorrow to another state, this matter would have little to no connection with Florida—this is precisely the type of jurisdictional issue explored by the Supreme Court in *Walden*." *Id.*

Like the defendant in *Lopatine*, Sturmanskie does not allege that Defendants engaged in any business in Florida or had any connection to Florida other than through Picturemaxx's communications with Plaintiff. Plaintiff fails to address Defendants' well-taken argument that those communications were only directed into Florida by virtue of *Plaintiff's* contacts with Florida, not Defendants'. If Plaintiff's counsel was located in another forum, Defendants would have sent communications into that forum, not Florida. Indeed, Defendants were responding to Plaintiff's

e-mails and had no control over where Plaintiff e-mailed from.  This is a quintessential example raised in *Walden*: without Plaintiff, Defendants simply have no connection to Florida.

Moreover, Plaintiff does not attempt to argue that Defendants have other contacts to Florida, unrelated to Plaintiff.  Instead, Plaintiff argues that "*Walden* does not overrule [the *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)] holding that a single act, where that contact would logically be solely with a plaintiff, can give rise to personal jurisdiction" but rather requires that "the act creates a 'substantial connection' by being aimed at the forum state and related to the cause of action, rather than at a plaintiff who just happens to reside in that state."  ECF No. [32] at 26.  But Plaintiff misses the mark; *Walden* requires that the Court look to Defendants' contacts with *the forum*, not Defendants' contacts with *Plaintiff*.  *See Walden*, 571 U.S. at 291 ("[I]t is the defendant, not the plaintiff or third parties, who create contacts with the forum State.").  Plaintiff's reliance on the argument that Defendants were sending e-mails and making phone calls with full knowledge that those communications were being directed at a Florida resident is simply not sufficient.  Indeed, putting aside whether those contacts actually caused the alleged harm, these communications are insufficient given that *Plaintiff* initiated the communications and invited a response.  Just as the *Walden* defendant's "actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections," Defendants did not establish minimum contacts by responding to Sturmanskie's counsel's e-mails, even if they knew Plaintiff's manager and operations were located in Florida.  *See id.* at 289.  The Supreme Court considered that the alleged harm in *Walden* arose in that forum merely by choice of the plaintiff, which was insufficient to establish jurisdiction.  *Id.* at 290.  Defendants here made no choice to create even minimal connections with Florida; any connection to Florida is purely a result of *Plaintiff's* conduct, which is insufficient.

Ultimately, the alleged conduct of Defendants is far too attenuated to Plaintiff's claims and the alleged harm that resulted in Florida.

Exercising personal jurisdiction in light of such attenuated contacts would not comport with due process. *See id.* at 286 ("Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State.") (quoting *Burger King,* 471 U.S. at 475). Indeed, one lawyer contacting another party's lawyer is precisely the sort of "unilateral activity" of another party that "cannot satisfy the requirement of contact with the forum State." *Id.* at 291 (citation omitted).[3]

Finally, the undersigned rejects the argument that Plaintiff can establish personal jurisdiction over Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2). A defendant's contacts with the United States as a whole may subject it to jurisdiction under Rule 4(k)(2), "[y]et, it is a rare occurrence when a court invokes jurisdiction under the rule." *Thompson v. Carnival Corp.*, 174 F. Supp. 3d 1327, 1337 (S.D. Fla. 2016); *Mwani v. Osama Bin Laden*. 417 F.3d 1, 13

---

[3] It should be noted that Defendants' communications that Plaintiff relies on to assert jurisdiction, *i.e.*, those that were directed into Florida, only concerned the Supreme Escrow Share Sale Agreement, not the Champlain SPA or Champlain Escrow Agreement. Indeed, the alleged communications only occurred after Champlain breached the Champlain SPA. "[A] fundamental element of the specific jurisdiction calculus is that plaintiff's claim must arise out of or relate to at least one of the defendant's contacts with the forum." *Mosseri*, 736 F.3d at 1355–56 (quoting *Fraser v. Smith,* 594 F.3d 842, 850 (11th Cir. 2010)). Plaintiff has not alleged any contacts that Defendants made in or into Florida that relate to these claims. Rather, Plaintiff alleges that Defendants transferred the Escrow Shares to Champlain in Germany. ECF No. [21] ¶ 50 ("The tortious acts in Florida are . . . Defendant [Picturemaxx], taking an action in Germany (the transfer of the Escrow Shares to Chaplain) which caused specific and foreseeable injury to Plaintiff in Florida)." Given Plaintiff's failure to plead any contacts between Defendant and Florida that led to Plaintiff's claims arising out of the Chaplain SPA and Champlain Escrow Agreement and Picturemaxx's transfer of the Escrow Shares to Champlain, asserting personal jurisdiction over Defendants as to Counts III–IV is particularly troublesome. *See Argos Glob. Partner Services, LLC v. Ciuchini*, 446 F. Supp. 3d 1073, 1086–87 (S.D. Fla. 2020) ("Specific jurisdiction is claim-specific.").

(D.C. Cir. 2005) (Rule was applied against Osama Bin Laden in terrorism case).   The instant case does not present *any* circumstance in which Rule 4(k)(2) should be applied.   Indeed, Plaintiff's Amended Complaint fails to allege facts that show that Defendant had *any* contacts with the United States "as a whole."   Likewise, the factual allegations in Mr. Kravtiz' Declaration, filed in support of Plaintiff's Response, fail to allege facts sufficient to establish nationwide contacts, instead noting that Picturemaxx has a New York office and certain media outlets within the United States use Picturemaxx's system.  *See* ECF No. [32-2] ¶ 17.   Indeed, Defendants' alleged typical business activities in the United States are "far from atypical for foreign corporations" and are not "so substantial" to render this an "exceptional" case warranting jurisdiction.  *See Thompson*, 174 F. Supp. 3d at 1338.   Accordingly, the undersigned **RECOMMENDS** that the Motion to Dismiss be **GRANTED** and this matter be dismissed for lack of jurisdiction.

### B.  Exchange Act Claim (Count I)[4]

To state a claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must allege: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the material misrepresentation or omission and the loss…." *Brophy v. Jiangbo Pharms., Inc.*, 781 F.3d 1296, 1301–02 (11th Cir. 2015) (citing *Mizzaro v. Home Depot Inc.*, 544 F.3d 1230, 1236–37 (11th Cir. 2008)).   Moreover, a plaintiff "must satisfy (1) the federal notice pleading requirements; (2) the special fraud pleading requirements found in Federal Rule of Civil Procedure 9(b); and (3) the additional pleading

---

[4] Although the issue of jurisdiction is dispositive of the remaining arguments, the undersigned submits her analysis of the grounds for dismissal under Rule 12(b)(6) in the event the District Court declines to adopt the undersigned's Recommendation as to jurisdiction.

requirements imposed by the Private Securities Litigation Reform Act of 1995 ('PSLRA')." *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (citations omitted).

In order to satisfy the federal notice pleading requirements, a plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Further, to fulfill the special fraud pleading requirements, Rule 9(b) states that complaints alleging fraud "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Specifically, the complaint must: (1) identify with particularity the statement(s) or omissions made, specifying in which documents or through oral representations; (2) the time, place, and person responsible for each statement or omission; (3) the content of any statement and "the manner in which they misled the plaintiff;" and (4) "what the defendants obtained as a consequence of the fraud." *Garfield v. NDC Health Corp.*, 466 F.3d 1255 (11th Cir. 2006) (citing *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001)). Additionally, under the PSLRA, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *FindWhat Inv. Grp.*, 658 F.3d at 1296 (quoting 15 U.S.C. §78u-4(b)(1)). Additionally, a claim under Section 10(b) of the Exchange Act carries a presumption against extraterritoriality. *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010). Claims may be brought under the Exchange Act only as to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities." *Id.* at 267.

As to Sturmanskie's securities claim, Picturemaxx[5] first argues that the Supreme Escrow Share Sale Agreement is "an entirely foreign transaction" beyond the scope of the Exchange Act

_____

[5] Sturmanskie alleges Count I against Defendant Picturemaxx, only.

20

under *Morrison*.  ECF No. [30] at 15–18.  Also, Picturemaxx argues that Sturmanskie was not "irrevocably liable" to deliver the shares at the time of execution of the Supreme Escrow Share Sale Agreement in Florida, but rather after the condition precedent of Supreme making payment. *Id.* at 17.  Moreover, even if Plaintiff had alleged that it incurred irrevocable liability in Florida, Picturemaxx contends, the Eleventh Circuit provides the "transfer-of-title" test to determine where the purchase or sale of securities took place, such that the place of payment in the Florida Account is irrelevant.  *Id.* at 17–18.  Finally, Picturemaxx argues that Plaintiff fails to meet the heightened pleading standards under Rule 9(b) and the PSLRA.  *Id.* at 15–26.

In response, Sturmanskie argues that under the "irrevocable liability test," an alternative means of alleging a domestic transaction in addition to the "transfer of title" test, "[t]he physical location of where Plaintiff became 'irrevocably bound' to the Supreme [Escrow Share Sale Agreement] can be the sole determining factor" as to whether a transaction is domestic.  ECF No. [32] at 12–13.  Plaintiff argues that Plaintiff incurred irrevocable liability in Florida, regardless of the Supreme Escrow Share Sale Agreement's condition precedent.  *Id.* at 14.  As to whether Plaintiff pled its securities claim with particularity, Plaintiff argues that it has pled that Picturemaxx made communications acknowledging Sturmanskie as the owner of the Escrow Shares, based on a decision by the Management and Advisory Boards.  *Id.* at 15–16.  Plaintiff argues it has pled that the Management and Advisory Boards "believed that this would both avoid a lawsuit by Plaintiff in Germany and help them deliver the Escrow Shares to Champlain." *Id.* at 16.  Plaintiff contends that the Amended Complaint pleads Plaintiff would not have entered into the Supreme Escrow Share Sale Agreement if not for the alleged misrepresentations and omissions.  *Id.* at 17.  Plaintiff argues that Picturemaxx's "tortured[] interpretation of the August 26th Email which is contrary to German law" "goes well outside the four corners of the [Amended

Complaint]." *Id.*  Next, Plaintiff argues that it has sufficiently alleged a "strong inference" of scienter, taking all communications as a whole, because Picturemaxx "preferred Champlain as a shareholder." *Id.* at 17–18.  Plaintiff also notes that Picturemaxx "does not produce any example of any warning to Plaintiff that it should not enter into the Supreme SPA" due to the possibility that Plaintiff might not be the owner of the Escrow Shares in Picturemaxx's eyes.  *Id.* at 19.

In the Reply, Picturemaxx maintains that the test for extraterritoriality is the "transfer of title," under which Germany is the "location of the purchase or sale of the security."  ECF No. [38] at 6–7.  Picturemaxx asserts that its representations came from counsel, as opposed to a director or employee, and were not false when made, and that Picturemaxx did not approve the Supreme Escrow Share Sale Agreement.  *Id.* at 8–10.  Finally, Picturemaxx argues that Plaintiff fails to plead scienter as to the Individual Defendants.  *Id.* at 10–11.

The undersigned first considers whether Plaintiff's securities claim is barred by the *Morrison* presumption against extraterritoriality.  There is no dispute that Picturemaxx's shares were not listed on a domestic stock exchange, so the only issue under *Morrison* is whether the purchase or sale occurred in the United States.  *See Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens CVC Tur Limitada*, 645 F.3d 1307 (11th Cir. 2011).  Defendants correctly argue that the Eleventh Circuit has explicitly adopted the "transfer of title" test, as opposed to the Second Circuit's "irrevocable liability" test.  *See id.*  Given that this Court is bound by Eleventh Circuit precedent, Plaintiff must allege that the "transfer of title" did take place in Florida—the intended transfer of title is not enough.  Indeed, in *Quail Cruises*, the District Court dismissed plaintiff's amended complaint because it read the complaint "as alleging only that the parties *intended* the closing to occur in the United States."  *Id.* at 1310 (emphasis in original).  The Eleventh Circuit reversed and remanded, because the amended complaint in fact "clearly alleged . . . that '[t]he

transaction for the acquisition of the Templeton stock closed in Miami, Florida on June 10, 2008, by means of the parties submitting the stock transfer documents by express courier into this District . . . ." *Id.* (internal citation omitted).  Plaintiff's securities claim is premised on the allegation that no transfer of title happened between Sturmanskie and Supreme.  Accordingly, Plaintiff's Amended Complaint fails to allege a domestic transaction, and cannot possibly do so given the facts as currently alleged.

The undersigned next turns to the question of whether Plaintiff has sufficiently alleged a securities violation under the heightened pleading standards.  While Plaintiff and Defendants challenge the other's reliance on affidavits or exhibits attached to the briefing, the Court is limited to "the four corners of the complaint."  *See SFM Holdings, Ltd.*, 600 F.3d at 1337.  Limited as such, the undersigned finds that although various elements are pled with particularity, such as the speaker, means of communication, and date of the e-mails sent by Picturemaxx's counsel, the allegations still fail to meet Plaintiff's heightened burden.  Indeed, as to falsity, Plaintiff has failed to allege that Picturemaxx's counsel's representation that Picturemaxx understood Plaintiff to be the rightful owner of the Escrow Shares was false or misleading at the time that it was made.  In *Bryant v. Avado Brands, Inc.*, the Eleventh Circuit set forth that "severe recklessness" satisfies the scienter element and is "limited to those highly unreasonable omissions or misrepresentations that involve . . . an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or so obvious that the defendant must have been aware." 187 F.3d 1271, 1282 n.18 (11th Cir. 1999).  Plaintiff merely concludes, without supporting factual allegations, that the statements and omissions in the e-mail and phone communications were false when made.

As to scienter, the Amended Complaint fails to allege any specific conduct on the part of the Individual Defendants, beyond its conclusory assertion that Picturemaxx's Advisory and Management Boards made the decision to recognize Sturmanskie as the owner of the Escrow Shares.  Given the lack of any factual allegations concerning the conduct of the Individual Defendants, the Amended Complaint fails to plead scienter.  *See Thompson v. RelationServe Media, Inc.,* 610 F.3d 628, 635 (11th Cir. 2010) ("Here, the Second Amended Complaint fails to sufficiently plead scienter as to any of the individuals who served as corporate directors or officers of RelationServe, and there are no other allegations that give rise to an inference of scienter.  Thus, we affirm the district court's dismissal of Count I for failure to state a cause of action under § 10(b) and Rule 10b–5 of the Securities Exchange Act.").  Accordingly, Count I fails to state a claim.

### C.  Tortious Interference Claims (Counts II, III, and IV)

To state a claim for tortious interference with a contractual or business relationship under Florida law,[6] a plaintiff must allege: (1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, or a contractual relationship, under which plaintiff has legal rights; (2) proof of the interfering party's knowledge of the relationship; (3) intentional and unjustified interference with this relationship; and (4) damage to plaintiff as a result of the interference.  *Burger King Corp. v. Ashland Equities, Inc.*, 161 F. Supp. 2d 1331, 1336 (S.D. Fla. 2001).  As to whether interference is justified or unjustified, Florida courts have held that when "a defendant interferes with a contract in order to safeguard a preexisting economic interest of his

---

[6] "Florida courts have determined that tortious interference with a business relationship and tortious interference with a contract are nearly identical causes of action, with the 'only material difference' being 'in one there is a contract and in the other there is only a business relationship.'" *Landmark Bank, N.A. v. Cmty. Choice Fin., Inc.*, No. 17-60974-CIV, 2017 WL 4310754, at *20 (S.D. Fla. Sept. 28, 2017) (quoting *Smith v. Ocean State Bank*, 335 So. 2d 641, 642 (Fla. 1st DCA 1976)).

own, the defendant's right to protect his own established economic interest outweighs the plaintiff's right to be free of interference, and his actions are usually recognized as privileged and nonactionable" unless a "plaintiff alleges 'a purely malicious motive' divorced from any 'legitimate competitive economic interest.'"   *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1280 (11th Cir. 2015) (quoting *Heavener, Ogier Servs. Inc. v. R.W. Florida Region Inc.*, 418 So. 2d 1074, 1076, 1077 (Fla. 5th DCA 1982)).   However, interfering with a contractual or business relationship is not justified when the interfering defendant is a "third party" or "stranger" to the relationship. *Landmark Bank, N.A. v. Cmty. Choice Fin., Inc.*, No. 17-60974-CIV, 2017 WL 4310754, at *21 (S.D. Fla. Sept. 28, 2017).   It is further understood that a party is not a stranger to a contractual or business relationship if it has a beneficial or economic interest in, or control over, that relationship, including a supervisory interest or potential financial interest.   *Hamilton v. Suntrust Mortg. Inc.*, 6 F. Supp. 3d 1312, 1320 (S.D. Fla. 2014).

In their Motion to Dismiss, Defendants move to dismiss Sturmanskie's three tortious interference claims—Count II (Supreme Escrow Share Sale Agreement), Count III (Champlain SPA and Champlain Escrow Agreement), and Count IV (Champlain business relationship).   ECF No. [30] at 26–31.   First, as to Counts II, III, and IV, Defendants argue that Plaintiff fails to allege an unjustifiable interference because Defendants are a "necessary party" and "the source of the business opportunity" to the Supreme Escrow Share Sale Agreement, Champlain SPA and Champlain Escrow Agreement, and business relationship with Champlain.   *Id.* at 27.   Specifically, Defendants contend that they cannot be a stranger to the contracts or relationship because they have a supervisory role under the German Stock Corporation Act, analogous to a franchisor-franchisee relationship.   *Id.* at 27–28 (citing *Burger King Corp. v. Berry*, No. 20-CV-21801, 2020

WL 10224201, at *12 (S.D. Fla. Sept. 4, 2020)).  Second, as to Count III (Champlain SPA and

Champlain Escrow Agreement), Defendants argue that Plaintiff has failed to plausibly allege that

a contract existed at the time of the alleged tort because Champlain breached the SPA in 2018 so

"Defendants' subsequent actions in 2019 and later could not have induced a breach that already

occurred without Defendants' involvement." *Id.* at 29 (emphasis removed).  Similarly, as to Count

IV (Champlain business relationship), Defendants argue that Plaintiff fails to plead that there was

an ongoing business relationship between Sturmanskie and Champlain, given this timing.  *Id.* at

29–30.

Plaintiff responds that Defendants are, in fact, "strangers" to the Supreme Escrow Share

Sale Agreement, the Champlain SPA and Champlain Escrow Agreement, and the business

relationship between Plaintiff and Champlain.  ECF No. [32] at 30.  Specifically, Plaintiff contends

that Defendants misrepresent the German Stock Corporation Act, which merely "creates a

ministerial obligation" concerning registration of shares, as opposed to a supervisory role.  *Id.*

Accordingly, Plaintiff argues that unlike Defendants' cited cases, where the intervening party had

a contractual right to approve a transaction, "neither the Supreme [Escrow Share Sale Agreement]

nor the Champlain SPA required or was conditioned upon Defendants' approval."  *Id.*  Plaintiff

also argues that the alleged "condition precedent" of requiring Plaintiff to get on the share register

is within Defendants' sole control under their theory.  *Id.* at 31.  Second, Plaintiff contends that it

has alleged that Defendants acted in bad faith.  *Id.* at 32.  Third, Plaintiff contends that Defendants

overly focus on the requirement of a "breach" and note that courts have looked to "frustrating the

purpose of[] the contract."  *Id.* at 32 (citing *Ashland Equities*, 161 F. Supp. 2d at 1336).  Plaintiff

argues that Champlain still had a continuing obligation to pay the purchase price or return the

Original Shares and that Defendants frustrated the purpose of the Champlain SPA because

"Champlain's payment obligations [are] effectively unenforceable" without the Escrow Shares providing security. *Id.* at 33.  Plaintiff also argues that it does not matter that its relationship with Champlain was strained, given that Plaintiff alleges that absent "Defendants deposit[ing] the Escrow Shares in Champlain's account, in all probability, Plaintiff would have ended up with either the purchase price, the Original Shares, or the Escrow Shares." *Id.* at 34.

In their Reply, Defendants take issue with Plaintiff's argument that Sturmanskie's duty was merely ministerial and maintain that "Defendants' statutory duties regarding share registration matters [are] similar to contractual franchise agreements granting franchisors a right of validation of certain of their franchisees' decisions."  ECF No. [38] at 12 (citing *Berry*, 2020 WL 10224201, at *13).  Further, as to Count III (Champlain SPA and Champlain Escrow Agreement) and Count IV (Champlain business relationship), Defendants maintain that the contract had already been breached and the relationship had already deteriorated. *Id.* at 14.

As to Count II (Supreme Escrow Share Sale Agreement), Sturmanskie has sufficiently alleged three of the four elements for tortious interference of contract rights.  Sturmanskie has alleged the existence of the Supreme Escrow Share Sale Agreement; that Defendant had knowledge of the contract, as evidenced through the e-mail and phone exchanges between Sturmanskie's and Defendants' counsel; and that the breach of the Supreme Escrow Share Sale Agreement resulted in damages.  Defendants challenge whether Sturmanskie has pled the remaining element, intentional and unjustified interference.

In evaluating whether interference with a contractual relationship is justified, courts consider whether a party is a "stranger" to the contract or relationship. *Hamilton*, 6 F. Supp. 3d at 1320.  Specifically, if a defendant is a stranger to a business or contractual relationship, then the interference is unjustified. *Treco Intern. S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1289 (S.D. Fla.

2010).  However, "[a] defendant is not a stranger to a business relationship if the defendant has any beneficial or economic interest in, or control over, that relationship."  *Id.* (emphasis removed) (quoting *Palm Beach County Health Care Dist. v. Prof'l Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009)).  Here, Plaintiff requested approval of the Supreme Escrow Share Sale Agreement from Picturemaxx in order to complete the transaction, as evidenced by the alleged communications between counsel.  However, merely requesting approval does not signify that the Supreme Escrow Share Sale Agreement was conditioned upon the approval of Defendants.  Although Defendants cite to cases involving franchisor-franchisee relationships, Defendants concede that these cases are analogous but not directly on point, as Defendants do not argue that they had a contractual supervisory right, but a statutory one.  In *Berry*, the Court reasoned that "the Franchise Agreement . . . expressly conditions the sale of Restaurants upon BKC's prior written consent."  2020 WL 10224201, *38.  Likewise, in *Genet Co. v. Annheuser-Busch, Inc.*, the court stated that "[b]ecause plaintiffs' agreement with [the wholesaler] was specifically conditioned upon [defendant's] approval, as a matter of law, [defendant] cannot be liable for tortious interference with their agreement."  498 So.2d 683, 684 (Fla. 3d DCA 1986).

Unlike the agreements in *Berry and Genet Co.*, however, the transaction between Plaintiff and Supreme was not contingent upon approval of the agreement by Defendants and therefore does not make them a "necessary party" to the transaction.  Defendants and Plaintiff each argue that the Court should analyze German law to determine whether such a supervisory right exists here.  The undersigned need not do so, however, finding that the cases cited by Defendants do not support the proposition that the concerns of a franchisor-franchisee relationship apply here.  Likewise, Defendants argue that they are the "source of the business opportunity," because "[P]icturemaxx is plainly the source of the share certificates being transacted and the business opportunity

allegedly interfered with."  ECF No. [30] at 21 (internal quotations omitted).  However, while Defendants sell shares on the market, that does not make Defendants the source of Plaintiff's contract to sell the Escrow Shares to Supreme.  Similarly, in *Nautica Intern., Inc. v. Intermarine USA, L.P.*, the Court determined that even though "securing the [] contract was a condition precedent to these sales, this does not make [defendant] the source of Nautica's contract." 5 F. Supp. 2d 1333, 1345–56 (S.D. Fla. 1998) (internal quotations omitted).  Accordingly, should the District Court disagree with the undersigned's personal jurisdiction analysis, Plaintiff has adequately pled Count II (Supreme Escrow Share Sale Agreement).

The undersigned next addresses Count III (Champlain SPA and Champlain Escrow Agreement) and Count IV (Champlain business relationship).  For the same reasons discussed above, Defendants fail to show that the alleged interference was justified by virtue of Defendants' supervisory role.  Like the Supreme Escrow Share Sale Agreement, the Champlain SPA and Champlain Escrow Agreement were not contingent upon approval by Defendants, and Defendants were not the source of Plaintiff entering into a business or contractual relationship with Champlain merely because that relationship and contract concerned Picturemaxx shares.

Defendants raise additional issues as to the Champlain-related counts. As to Count III (Champlain SPA and Champlain Escrow Agreement), Defendants argue that Plaintiff has failed to plead that Defendants induced a breach.  As to Count IV (Champlain business relationship), Defendants contend that there was no ongoing business relationship.  Both of these arguments concern the timing of the Champlain SPA and the subsequent communications between Plaintiff's and Defendants' counsel, which Plaintiff alleges caused tortious interference.

"As a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which

in all probability would have been completed if the defendant had not interfered." *TracFone Wireless, Inc. v. Narula*, No. 07-22202-CIV, 2008 WL 11407177, at *9 (S.D. Fla. 2008) (quoting *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994). Indeed, the Amended Complaint demonstrates that Sturmanskie's and Champlain's business relationship had deteriorated to a point such that Plaintiff cannot plausibly allege that the Champlain SPA would have been completed if the Defendants had not interfered. Sturmanskie also admits that it stopped pursuing performance by Champlain so it cannot plausibly allege that the agreement would have been completed but for Defendants' interference. *See Boldstar Tech. LLC v. Home Depot, Inc.*, 517 F. Supp. 2d 1283, 1288 (S.D. Fla. 2007) ("Plaintiffs have made no factual allegation tending to show that negotiations would have continued and that plaintiffs and Home Depot would have necessarily reached an agreement . . . ."). Accordingly, Plaintiff fails to state a claim as to Count III (Champlain SPA and Champlain Escrow Agreement) and Count IV (Champlain business relationship).

### D.  Conversion (Count V)

To state a claim for conversion, a plaintiff must show an "(1) act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein." *J & J Sports Productions, Inc. v. Pit Rest., Inc.*, No. 14-CV-24264, 2015 WL 12781196, at *2 (S.D. Fla. Feb. 20, 2015) (quoting *Del Monte Fresh Produce Co. v. Dole Food Co.*, 136 F. Supp. 2d 1271, 1294 (S.D. Fla. 2001)) (emphasis removed). Moreover, an action for conversion is a "possessory action and the plaintiff must have a present or immediate right of possession of the property in question." *Page v. Matthews*, 386 So. 2d 815, 816 (Fla. 5th DCA 1980).

Defendants challenge Plaintiff's conversion claim by arguing that Plaintiff actually admits that it did not and could not possess the Escrow Shares. ECF No. [30] at 31. Specifically,

Defendants contend that the August 26th e-mail does not indicate that Plaintiff had an immediate right to possession of the Escrow Shares, as Plaintiff alleges, because that communication actually told Plaintiff that it needed to open a suitable bank account in order for delivery of the Subject Shares to take place. *Id.* Further, Defendant argues that Sturmanskie contradicts itself by arguing both that it sold the Original Shares and also had "an immediate right to possess what it already sold." *Id.* Defendants cite to *United States v. Bailey*, 419 F.3d 1208, 1214 (11th Cir. 2005), to argue that "[a]n owner who has neither possession nor the immediate right to it at the time of the conversion cannot maintain an action for [conversion]." *Id.*

Sturmanskie responds that Defendants' argument that "because a tortfeasor denies possession (or the ability to possess) to the owner/victim, it succeeds in extinguishing the owner/victim's rights to possession" is incorrect. ECF No. [32] at 34. Plaintiff notes that intent is not an element of conversion and so "Plaintiff has pled that it owns the Escrow Shares as a result of Champlain's default regardless of whether Defendants acknowledge it or not." *Id.* Finally, Plaintiff argues that it has pled "backstop" allegations that the Original Shares were converted and that under Defendants' theory where Plaintiff does not own the Escrow Shares because the Champlain SPA was "null and void," then Plaintiff would have been deprived of the Original Shares that Defendants transferred to Champlain, constituting a conversion. *Id.* at 36.

In their Reply, Defendants argue that the key issue that defeats Sturmanskie's conversion claim is that Sturmanskie's own allegations show that "enjoyment of its possessory interest [in the shares] was a legal impossibility" and "[p]ossessory interests that are legally impossible to realize are not grounds for a conversion claim." ECF No. [38] at 15 (citing *United States v. Bailey*, 288 F. Supp. 2d 1261, 1278 (M.D. Fla. 2003), *aff'd*, 419 F.3d 1208 (11th Cir. 2005)). According to Defendants, "Sturmanskie had no valid 'right to possession' when enjoyment of the right was

barred for the reasons it alleges." *Id.* Defendants also maintain that Plaintiff's alternative argument concerning conversion of the Original Shares is contradictory. *Id.*

Plaintiff's argument that Defendants' challenge to the conversion claim conflates ownership with registration is well-taken. Plaintiff alleges that it owned the Escrow Shares. Plaintiff also alleges that Defendants converted that ownership interest when it transferred the Escrow Shares to Champlain. Had Defendants not transferred the Escrow Shares, Plaintiff still would have owned them, whether or not they were ever registered. However, as Defendants note, Sturmanskie could not have an immediate right to possession over the Original Shares because Plaintiff alleges that is *sold* the Original Shares to Champlain. In fact, Plaintiff's ownership of the Escrow Shares arose from its sale of the Original Shares. Moreover, Plaintiff does not sufficiently plead the timing or circumstances of the alleged transfer of the Original Shares to Champlain, away from Plaintiff. While Plaintiff alleges that, around March 2021, it learned that Defendants had transferred the Escrow Shares to Champlain, ECF No. [21] ¶ 37, it fails to allege when or how Defendants transferred the Original Shares. Such facts are relevant as to whether Plaintiff could have had a possessory interest at the time of the conversion. Therefore, Plaintiff has not sufficiently alleged a claim of conversion as to the Original Shares.

### E. Conspiracy (Count VI)

Under Florida law, "the elements of civil conspiracy are: (1) an agreement between two or more parties (2) to do an unlawful act by unlawful means; (3) the doing of some overt act to further the conspiracy; and (4) damage to the plaintiff as a result of the acts done under the conspiracy." *W.P. Productions, Inc. v. Tramontina USA, Inc.*, No. 18-63162-CIV, 2019 WL 10092981, at *8 (S.D. Fla. July 30, 2019) (citing *GolTV, Inc. v. Fox Sports Latin Am. Ltd.*, 277 F. Supp. 3d 1301, 1312 (S.D. Fla. 2017); *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997)).

Moreover, civil conspiracy is not a stand-alone-claim but rather "the plaintiff must allege an underlying illegal act or tort on which the conspiracy is based." *Id.* (citing *Raimi*, 702 So. 2d at 1284). Additionally, "the Eleventh Circuit requires a heightened pleading standard in conspiracy cases because a defendant must be informed of the nature of the conspiracy alleged." *See Prestige Restaurants & Entm't, Inc. v. Bayside Seafood Rest., Inc.*, No. 09-23128-CIV, 2010 WL 680905, at *8 (S.D. Fla. Feb. 23, 2010), *aff'd sub nom. Prestige Restaurants & Entm't, Inc. v. Bayside Seafood Restaurant, Inc.*, 417 Fed. App'x. 892 (11th Cir. 2011) (citation and quotations omitted).

Defendants argue that the conspiracy claim must be dismissed under the intracorporate conspiracy doctrine, which provides that "a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." ECF No. [30] at 33 (quoting *Rossi v. Darden*, No. 16-21199-CIV, 2016 WL 11501449, at *8 (S.D. Fla. July 19, 2016)). Defendants note that a corporation acts through its employees, including directors and officers. *Id.* (citing *Greenberg v. Mount Sinai Med. Ctr. of Greater Miami, Inc.*, 629 So. 2d 252, 256 (Fla. 3d DCA 1993)). Thus, Defendants argue, it is "well settled that a corporation cannot conspire with those persons unless the individual has a personal stake in the activity apart from that of the corporation." *Id.* (citing *Buckner v. Lower Fla. Keys Hosp. Dist.*, 403 So. 2d 1025, 1029 (Fla. 3d DCA 1981)). Moreover, the personal stake must be separate from the interests of the corporation and cannot just be "animosity on the part of the agent." *Id.* (quoting *Mancinelli v. Davis*, 217 So. 3d 1034, 1037 (Fla. 4th DCA 2017)). According to Defendants, Sturmanskie fails to allege that the Individual Defendants had a personal stake in the alleged conspiracy; specifically, there is no allegation that any Individual Defendant held animosity toward Plaintiff or stood to benefit from the alleged conspiracy. *Id.*

In the Response, Plaintiff argues that it has pled that "[Picturemaxx] and each of the Management Board and Advisory Board Defendants took overt acts" to transfer the Escrow Shares to Champlain, who was also a member of the conspiracy.  ECF No. [32] at 37.  Additionally, Plaintiff argues that conspiracy is evidenced by communications between Defendants and Champlain concerning the Escrow Shares, and by the successful transfer of Escrow Shares to Champlain.  *Id.*  Plaintiff contends it has alleged that each Individual Defendant conspired with Champlain and asserts it does not matter that Champlain is not named as a defendant.  *Id.* at 37–38.  Plaintiff contends that the "intracorporate conspiracy doctrine holds that the acts of corporate agents are attributed to the corporation itself."  *Id.* at 38.  But Plaintiff argues it need not address the doctrine further because at the very least, Picturemaxx and Champlain are alleged as conspirators, even if the Individual Defendants were found not to be.  *Id.*

In their Reply, Defendants contend that Plaintiff "fails to plausibly allege an agreement between Defendants and Champlain, even if Defendants' actions benefitted Champlain."  ECF No. [38] at 15–16.  Defendants contend that the communications between Defendants and Champlain are insufficient to infer agreement and thus the conspiracy claim must be dismissed.  *Id.*

The undersigned finds that Plaintiff has not sufficiently pled a conspiracy claim.  First, it is axiomatic that "a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves."  *Rossi*, 2016 WL 11501449, at *8 (quoting *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000)).  Thus, the only possible way for Plaintiff to state a viable conspiracy claim would be its allegations that Defendants conspired with Champlain.  But those allegations are purely conclusory and fail to allege any factual allegations detailing the conspiracy.  Even if Plaintiff alleges that Defendants and Champlain both wanted Champlain to own the Escrow Shares, this is insufficient

34

to allege a scheme that the parties participated in jointly.  *See Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1319 (S.D. Fla. 2014) ("Plaintiffs do not actually allege that Bank of America and Nationstar acted together, but merely that they engaged in the same 'scheme.'").

## V.      RECOMMENDATION

For the reasons stated below, the undersigned **RECOMMENDS** that Defendants' Motion to Dismiss be **GRANTED** on the basis that this Court lacks personal jurisdiction over Defendants.

## VI.      OBJECTIONS

A party shall serve and file written objections, if any, to this Report and Recommendation with the United States District Judge for the Southern District of Florida, within **FOURTEEN (14) DAYS** of being served with a copy of this Report and Recommendation.  Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this Recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions."  11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191–92 (11th Cir. 2020).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, on July 5, 2022.

_____
**JACQUELINE BECERRA**
**United States Magistrate Judge**